## LINCOLN CHEMICAL CO. v. EDWARDS, Collector.

(District Court, S. D. New York. April 19, 1921.)

1. **Internal revenue ☞7—Increased value of process resulting from expenditures thereon figures as asset in estimating "earned surplus."**

   Where the only asset of a corporation was a secret process, which was intangible and of no value in April, 1909, the date on which the actual value of intangible assets was to be determined under the Revenue Law, but thereafter money was expended in developing the process, so that in 1917 the company had a surplus above its capital stock, which was its only liability, the increased value of the process, due to the expenditures thereon, is to be considered as earned surplus, which, under Revenue Law 1917, § 207 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅜h), is an element of invested capital, in determining whether the corporation had more than a nominal invested capital under section 209 (section 6336⅜j), though the increased value of the process due to the war could not be so considered.

   [Ed. Note.—For other definitions, see Words and Phrases, Surplus Earnings.]

2. **Internal revenue ☞38—Evidence held not to show that earned surplus was only nominal.**

   In a suit for the refund of the excess profits tax, where plaintiff claimed that it was a corporation having only a nominal capital, evidence *held* to show that plaintiff had an earned surplus of at least $2,000, which, in view of the size of the business, whose receipts were approximately $3,000, was more than a nominal invested capital.

3. **Internal revenue ☞38—Burden is on taxpayer to show earned surplus, included in invested capital, was only nominal.**

   In a suit by a corporation for the refund of the excess profits tax on grounds that the corporation had only a nominal capital, the burden is on the plaintiff to show that the amount of its earned surplus, which is included in the invested capital, was only nominal.

At Law. Action by the Lincoln Chemical Company against William H. Edwards, as Collector, etc., for refund of a part of the excess profits tax for 1917. Verdict directed for defendant.

Action by a taxpayer against the collector for refund of a part of the excess profits tax for 1917. The plaintiff, a domestic corporation, filed its return for 1917 and calculated its capital upon the basis of section 209 of the law of October 3, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅜j); that is to say, it assumed that it had "no invested capital, or not more than a nominal capital." The treasury officials reassessed the tax at a larger figure upon a basis not now necessary to set forth, because it is conceded that the propriety of their action depends upon the correctness of the plaintiff's reading of section 209. If that is right, the plaintiff wins; if it is wrong, the defendant.

The case was tried before a jury of one, and at the conclusion of the evidence both sides moved for the direction of a verdict. The evidence, which was undisputed, showed the following state of facts:

The plaintiff was organized in April, 1909, under the laws of New York, with a capital stock of $10,000. There were but two persons financially interested in it, Loeb and Riddle. Riddle was an inventor, and before the incorporation came to Loeb with a process for extracting cocoa butter out of cocoa shells, a by-product. This process proved worthless, and Riddle thereupon suggested to Loeb the possibility of converting the process into one from which he could extract from cocoa shells a chemical substance, known as theobromine, allied to caffeine. Loeb, having some money, continued to ad-

vance it in defraying Riddle's further experiments, until he became fearful of too wide involvement, and determined to incorporate the venture. Riddle agreed to work for the corporation for five years at a salary of $1,800, and to convey his process, still unperfected, both for $2,400, par value, of the plaintiff's stock. Loeb agreed to convey the machinery and supplies par for par in stock, $7,400, and $200 was paid in cash.

During the year 1910 the company borrowed nearly $20,000, which it spent in Riddle's further experiments upon the process, which was then complete. During that year it got one Schaefer, a manufacturing chemist, to make a contract for the exploitation of the process on a royalty basis, but the sales of theobromine were so few that the royalty was never earned. In 1912 they got Schaefer to give them better terms; he agreed to pay $2,000 a year for the process over a period of 15 years, and to furnish theobromine to the plaintiff at $2.50 a pound, or less. This gave the plaintiff control of a supply without manufacturing. At the time of the first contract in 1910, the plaintiff sold all its machinery and plant to Schaefer for $1,155, and its supplies for $407, and this money was either used in development or upon the indebtedness. In any event, it had all disappeared before 1914. The plaintiff never manufactured any theobromine after 1910.

The plaintiff's profits on the sale of theobromine made by Schaefer under the process were not large throughout the year 1911, but they began to increase in 1912 and 1913, and the company thus made a small income, besides the royalty paid by Schaefer. The advent of the Great War in 1914 greatly increased the demand, and the business became very profitable, so that by January 1, 1917, all its debts were paid and it had a surplus of $13,000 after writing off a depreciation of $7,700 upon the process.

The business was done as follows: There were but three purchasers of theobromine, all large manufacturing chemists, who bought at 10 days, cash. The plaintiff necessarily bought all its theobromine (made under the process) from Schaefer at 15 days, cash, and was therefore in a position to pay Schaefer out of the moneys which its customers paid to it. As these were of high financial responsibility, it had no need to hold a reserve in its treasury, in order to finance its purchases, though at times, when in ample funds, it did use its surplus to pay Schaefer before the customers paid for their consignments.

During the year 1917 the assets of the plaintiff, therefore, consisted only of its cash on hand, the contract with Schaefer, and the secret process finally perfected by Riddle. Its stock was $10,000, and its surplus, as stated, $13,000, of which over $7,000 was in cash. It necessarily followed that its other assets were valued at $16,000.

The case depends upon the meaning of the phrase "invested capital" and "nominal capital," as used in section 209 and as defined in section 207. The plaintiff asserts that there was only $200 of cash paid in, no tangibles remaining after 1913, no surplus "used and employed" in the business, and that the secret process was an "intangible," which must be taken at its "actual cash value" in April, 1909, which is shown to be nothing. The defendant argues that the sums spent upon the process, which did in fact increase its value by $19,000, should be taken as a surplus "used and employed" in the business.

Robert B. Honeyman, of New York City, for plaintiff.

Richard S. Holmes, of New York City, and H. M. Darling, for the defendant.

LEARNED HAND, District Judge (after stating the facts as above). I shall decide this case upon the assumption that "nominal capital," in section 209, means "nominal invested capital," without, of course, passing upon that question. I shall further assume—and indeed on this point both sides agree—that the secret process of Riddle was "intangible property," within the meaning of section 207 (a) (3)

(b)—Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅜h. I shall finally assume that the process had only a nominal value in April, 1909, when it was sold to the plaintiff for $2,400 of stock. With these assumptions the question arises whether the money used to develop the process can be regarded as "paid in or earned surplus and undivided profits used or employed in the business" under section 207 (a) (3). On the trial I thought that the plaintiff was right on this point, and for clarity I shall therefore state its argument as strongly as I can. The statute, it says, prescribes that "intangible property" of this kind "shall be included in invested capital at a value not to exceed the actual cash value at the time of such purchase." Disregarding "paid-in surplus," of which there is none here, the "earned surplus" is the only item into which the supposed added value of the process can be placed. Now surplus, or at least "earned surplus," is merely an accountant's way of saying that the value of the assets is greater than the liabilities. When the statute speaks of "invested capital," it must be understood to refer to existing property. i. e., "means of production," and, to use accountant's language, not because accounts can ever of themselves be the basis of taxation, but because they are the most convenient record of actual values, embodied in property which is alone the proper basis of taxation. "Earned surplus" must therefore represent the value of existing property.

This being true, continues the plaintiff, the only asset of value in 1917 was the perfected process, and we may assume that it had enough value to give more than a "nominal" "earned surplus" above the capital stock, which was the only liability. Therefore, if the asset could be taken at its true value in 1917, section 209 of the statute would not apply. The difficulty with the collector's position, however, is that section 207 directed us to include the process at no more than its "actual cash value" in 1909, and at that time it had none. The money spent in improving and perfecting the process had, in 1917, no existence at all, save in the process itself. It was spent in machinery or supplies, or Riddle's living expenses, or salaries. So far as our treasury was concerned, there was nothing now left, except the process. That was, therefore, the only asset which could figure on the credit side of our account to establish any "earned surplus," and the statute forbade its inclusion at anything but a nominal value. Therefore we had no "earned surplus," and only a "nominal invested capital."

[1] This argument appears to me unanswerable, if the incompleted process be regarded as the same asset for all purposes when finally developed as when first acquired. The statute must, of course, mean something, and the least that it can mean must be, I think, that any automatic increase in value of a process or "other intangible property" must be disregarded. The "unearned increment," as economists would call it, will be ignored. Therefore I should altogether disregard any increase in the value of this process, dependent upon general conditions of industry, as, for example, the rise in the price of theobromine, due to the Great War. Furthermore, for the purposes of this case anyway, I may assume that an increase in the value of the process,

resulting from spending money in advertising or the like, which leaves it unchanged in itself, will fall into the same category. That question can await decision till it arises; I say nothing about it here.

The case at bar is, however, one where money has been spent in changing the property itself, so that, in place of a formula which prescribed one sequence of steps, there emerged another which prescribed a different sequence. Fair analogies appear to me, for example, cattle fed for market, or houses rebuilt or enlarged. It is true that for convenience we speak of such property as always remaining the same, though in fact it is not only different in value, but that difference results from a change in the objective character of the property itself; but that convenience should not disguise the substantial fact that it is, economically speaking, new property which appears.

When such changes have resulted from the expenditure of new capital, I see no reason why the statute should be construed as peremptorily directing that they should be disregarded. It is quite true still, as the plaintiff argues, that the "earned surplus" must be found in some assets, and that the only asset in the case at bar still remains the process; but it is a different process. The limitation of section 207 may be confined, without undue violence to the sense of the words, to such increases in value as arise without the addition of new capital, and it may be, to such others also as involve no objective change in the thing itself.

Indeed, it can scarcely be supposed that Congress could have had any other purpose than to prevent the taxpayer from crediting his capital account with increases which he had done nothing to produce. If they meant to include also new outlays upon existing capital, no matter how providently made, the statute provides a direct incentive to extravagance. Often, perhaps generally, it is a sound industrial policy to improve existing capital, rather than to scrap it, and invest anew. Yet, if the plaintiff be right, no such investment can ever do more than meet depreciation, and this would apply as well to "tangibles" as to "intangibles." The only new values which could be recognized would be in property bought outright after incorporation, and those investments which may have been the means of changing the industrial character and value of existing property, would be totally lost for purposes of taxation. When taxes can be as high as the excess profits tax may be, such inducements may become a patent influence upon industrial conduct, and it cannot be supposed that the result of the plaintiff's construction was within the purposes of Congress.

Again, it should be a weighty consideration with me that the Tax Bureau has made these allowances in the past in the case of thousands of taxpayers, and has drafted its regulations upon the assumption that the statute permits them. I therefore hold that, when money has been earned and spent in improving a process such as this, its increased value due only to that expenditure may figure as an asset in estimating under section 207 "earned surplus," if any, as an element of "invested capital."

[2] It does not follow, of course, in the case at bar, that the value of the process so improved was enough to cause any "earned surplus"

272 F.—10

to emerge. That depends upon whether the assets, so estimated, were greater than the stock, $10,000, by more than a "nominal" amount. Now the value of the "tangibles" must, under section 207, be taken as of January 1, 1914, at which time they had disappeared. Therefore the process must have increased from its nominal value in 1909 to more than $10,000 before any "earned surplus" could begin to appear at all. The value at which the plaintiff carried the process does not definitely appear on its books. On January 1, 1917, it had a surplus of $13,088.59, and therefore assets of $23,088.59. Of this, $7,367.64 was in cash, leaving $15,720.95 for other assets, which must be the process and the contract. The contract got its value only from the process, and may be disregarded. The value of the process as of that year would therefore appear to be this sum.

This figure, it is true, does not correspond with other evidence, and apparently is incorrect. In its income tax return for 1916 it valued the process as of March 1, 1913, at $19,716.84, and claimed a deduction for depreciation to date of $7,761.42, leaving a value of about $12,000 as of January 1, 1917. The discrepancy of some $3,700 I have been unable to account for, except upon the hypothesis that there were other assets not shown. Perhaps the cash was greater, because the cash book showed a balance on January 2, 1917, of $11,000, which just about makes up the difference. Assuming that this is the proper explanation, still on the plaintiff's own admission it had an "earned surplus," of $2,000, which in view of the size of the business I should not consider "nominal."

[3] But the defendant was not bound by the plaintiff's admission. It was for the plaintiff to prove that it had only a nominal capital. The process was clearly of very substantial value. The contract had 10 years more to run, and there was a minimum royalty of $2,000. Besides this, the plaintiff could call for at least 3,000 pounds of theobromine yearly at not more than $2.50 a pound, a right which had been of substantial value in the years before the war began to affect the price. In 1914 this right was worth $525, and the royalty apparently $2,854. Moreover, when the contract terminated, the process would not necessarily become worthless. Indeed, it may have a very substantial value for an indefinite time. The plaintiff has certainly failed to prove that its value in 1917 over $10,000 was "not more than nominal."

I therefore conclude that the case is not proved, and will direct a verdict for the defendant.