### CARTIER et al. v. DOYLE, U. S. Internal Revenue Collector.

(Circuit Court of Appeals, Sixth Circuit. December 15, 1921.)

No. 3541.

Internal revenue ⬅7—Partnership held without "invested capital" for purposes of excess profits.

A partnership having a nominal capital, but with no money or property paid in as capital by the partners, and which conducted its business entirely on money borrowed from a bank on its notes indorsed by the partners, and further secured by collateral deposited by one of them, *held* to have no "invested capital" as defined in Act Oct. 3, 1917, § 207 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅜h), and to be subject to excess profits tax at the rate of 8 per cent. of its net income under section 209 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅜j).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Capital Invested.]

In Error to the District Court of the United States for the Southern Division of the Western District of Michigan; Clarence W. Sessions, Judge.

Action by Charles E. Cartier and Edward M. Holland, copartners as the Cartier-Holland Lumber Company, against Emanuel J. Doyle, Collector of Internal Revenue. Judgment for defendant (269 Fed. 647), and plaintiffs bring error. Reversed.

On the 20th day of May, 1912, Charles E. Cartier and Edward M. Holland, entered into a written contract of partnership for the purpose of manufacturing and dealing in forest products, including lumber, timber, ties, shingles, laths, etc., and also timbered, improved and cutover lands.

It was further agreed that the paid-in capital of the partnership should be $30,000, any portion or all of which amount should be furnished to the partnership by Charles E. Cartier, as the requirements of the partnership appear upon the note or notes of the partnership to be paid at the earliest practicable opportunity out of the net earnings of the partnership business, and to bear legal rate of interest.

It does not appear from the evidence that this partnership ever manufactured any forest products, but it did purchase lumber and kindred commod-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ities to fill current orders of its customers, but not for speculative purposes based upon rise and fall of the market. It kept no lumber yard and kept no lumber in stock, and the only lumber owned by it was lumber in transit from the mill from which it was purchased by the partnership, to the partnership's customers. In a few cases, however, where the lumber was rejected by the customer it was held by the partnership until it could be sold to another purchaser. In 1917 the partnership also negotiated sales for timber and secured an option on a large acreage of timber land in its own name, but in fact for William and Samuel Horner, who furnished the $1,000 necessary to be paid for this option and the additional $500 necessary to extend the option beyond the 60 days named therein.

For services in this transaction the partnership received $20,353, which is by far the largest single item in the aggregate of the net income of $47,018 earned by the partnership in 1917.

It further appears from the record that after the organization of the partnership, which was known as the Cartier-Holland Lumber Company, Cartier did furnish it some money and took its notes therefor, but in 1914 a new arrangement was entered into by which the partnership borrowed the money required in its business directly from the bank and executed its notes therefor. These notes were indorsed by both Cartier and Holland, and Cartier left upon deposit with the bank, as collateral to his indorsement of these notes, securities theretofore deposited by him when he borrowed the money in his own name and loaned it to the partnership. It was also further understood and agreed between the bank and the partnership, when these loans were negotiated, that if at any time the collateral deposited by Cartier seemed to the bank to be insufficient to cover his liability as indorser on the notes of the partnership, Holland would furnish further collateral security. This method of transacting the partnership business was continued until and during the year 1917, and in this way the partnership obtained all its capital, including the money required by it to discount its bills for lumber and other commodities purchased by it and sold to its customers.

It further appears that during the time the partnership was operated Cartier drew out of the partnership business $11,556.37, and Holland $18,-106.28, which amounts were charged to them on the books of the partnership. If these amounts withdrawn by the partners are reckoned as assets of the partnership, then on January 1, 1917, there was a net surplus of assets over and above liabilities of $22,443.80; otherwise the liabilities of the partnership would exceed its assets by the sum of $7,218.85.

The partnership paid an excess profit tax of 8 per cent. of its net income of $47,018 for the year 1917 under the provisions of section 209 of title 2 of the act of October 3, 1917, amounting to $3,761.44. Later a supplemental return was requested by the Commissioner of Internal Revenue, who then notified the partnership that its claim for assessment based upon the provisions of section 209 of the Excess Profits Tax Law had been disallowed, and that the tax had been computed and assessed against it under sections 201 and 210 and articles 18, 24 and 52 of Regulation No. 41.

This tax, based upon an estimated capital of $118,515.85, amounted to $12,-788.90, or a balance over the amount already paid of $9,027.46 which additional tax was paid under protest. Later the partnership brought an action in the District Court of the United States for the Western District of Michigan, Southern Division, to recover the additional tax levied and demanded by the Internal Revenue Commissioner and paid by it under protest.

The parties having expressly waived a jury, the cause was submitted to the District Court upon the pleadings and the evidence, resulting in judgment for the defendant. Findings of fact were submitted by the plaintiff and defendant, but the court refused to adopt these findings or either of them, and ordered that its opinion should constitute its findings of fact and conclusion of law, to which findings, conclusion, and judgment exceptions were taken by the plaintiff in error.

Julius H. Amberg, of Grand Rapids, Mich. (Willard F. Keeney, Roger C. Butterfield, and Julius H. Amberg, all of Grand Rapids, Mich., on the brief), for plaintiffs in error.

Myron H. Walker, U. S. Atty., of Grand Rapids, Mich., and H. M. Darling, Bureau of Internal Revenue, of Washington, D. C. (Carl A. Mapes, Solicitor of Internal Revenue, of Washington, D. C., and Myron H. Walker, U. S. Atty., of Grand Rapids, Mich., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). The only question presented by this record is whether or not the partnership of Cartier-Holland Lumber Company during the year 1917 had an invested capital within the meaning of sections 201, 207, and 210 of title 2 of the act of Congress approved October 3, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 6336⅜b, 6336⅜h, 6336⅜k).

If this question were to be determined separate and apart from the act levying this excess profit tax, then it would be of easy solution. Money invested in a partnership business, whether paid in by the partners or borrowed from a partner or a bank, in the absence of legislation to the contrary, would constitute invested capital in the ordinary meaning and acceptation of that term. Congress, however, evidently for the purpose of protecting the government from claims of inflated capitalization, thought it wise and necessary to define the term "invested capital," which is made the basis of the computation of the tax to be levied under the authority conferred by this act. To that end section 207 provided, among other things, the following:

"As used in this title 'invested capital' does not include stocks, bonds (other than obligations of the United States), or other assets, the income from which is not subject to the tax imposed by this title nor money or other property borrowed, and means, subject to the above limitations:

"(a) In the case of a corporation or partnership: (1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor), and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year. * * *"

In the construction of the act of Congress of which this definition is a part, this legislative definition of the term "invested capital" must be accepted as final and conclusive, regardless of any preconceived notion the public generally, or this court, may have as to the meaning of that term.

In the construction of this statute it must also be remembered that it is the settled rule not to extend the provisions of taxing statutes by implication, or to enlarge their operation, so as to embrace matters not specifically covered thereby. Gould v. Gould, 245 U. S. 151, 38 Sup. Ct. 53, 62 L. Ed. 211.

The trial court based its judgment for the defendant upon the conclusion of law that the collateral deposited by Cartier as security for his liability as an indorser of the partnership notes became a part of the working capital and was used and employed in the business of the company to the same extent as if it had been paid directly into the partnership funds.

This conclusion of law is not supported by the facts found by the court or by any evidence in this record. The articles of copartnership provide that the paid-in capital of the partnership is to be $30,000, any or all portions of which amount are to be furnished to the partnership, upon notes signed by it, and to be paid at the earliest practicable opportunity out of the net earnings of the partnership.

It would seem unnecessary to say that a private contract between these parties would not change or affect in the slightest degree the plain and positive terms of the statute, declaring what shall be included and what shall not be included as "invested capital," for the purpose of this tax. If the articles of copartnership had provided that the paid-in capital of the partnership should be $30,000, one-third of which should be paid in cash or in property by the partners, and $20,000 to be borrowed from a bank upon the notes of the partnership, indorsed by the partners, and further secured by the deposit of such collateral as the bank might demand, the money borrowed in pursuance of such partnership agreement, fixing the total capital of the partnership at $30,000, would necessarily be rejected as invested capital in the computation of surplus income taxes levied under this act. It logically follows that if, under this statutory definition of invested capital, money borrowed could not be included as capital where some substantial amount of cash had actually been paid into the partnership fund by the partners, such borrowed money cannot be reckoned as invested capital where the partners contributed neither cash nor property to the partnership capital.

The original plan of operation written in the partnership agreement was abandoned as early as 1914, and thereafter the money used in the partnership business was borrowed directly from the bank upon the notes of the partnership, payable unconditionally and at certain fixed times, regardless of net earnings or any other contingency. While these notes were indorsed by the individual partners, nevertheless the money was borrowed by the partnership for partnership purposes, and it was primarily liable for the payment of these notes. Collateral held by the bank, a stranger to the partnership, whether the property of one or of both partners, was a mere incident to the loan, and can in no wise affect the character of the transaction.

It is therefore wholly unnecessary to determine whether under the original agreement the money to be furnished by Cartier, to be repaid out of the partnership earnings, would or would not be borrowed money within the meaning of this act. Nor is it important at whose suggestion this plan of operation was changed and the new plan adopted. It is sufficient for the purposes of this opinion to determine the legal effect of these transactions as they occurred during the taxing period of 1917. The evidence in relation to these transactions permits of no con-

clusion other than that the money borrowed from the bank upon the notes of the partnership was "borrowed money," within the meaning of section 207 of the act of Congress approved October 3, 1917.

The clear, positive, and unambiguous language of section 207 of this act is not subject to any other construction, regardless of the exigencies of any particular case. First it provides that borrowed money or other property shall not be included in the term "invested capital" as used in that title. Paragraph A of that section then specifically states what shall be included in determining the "invested capital" of a corporation or partnership as follows: "(1) Actual cash paid in." There is no claim made by the government that there was any "actual cash paid in" to the partnership funds other than the money borrowed from the bank on the notes of the partnership, indorsed by the partners, the indorsement of Cartier being secured by collateral deposited by him. "(2) The actual cash value of tangible property paid in other than cash for stock or shares in such corporation or partnership." In this case there was no tangible property paid in by either partner for the purpose named or for any other purpose. The collateral deposited by Cartier could not upon any reasonable hypothesis be held to be "tangible property paid in" to the partnership. It was not deposited with, transferred, or assigned to the partnership, and the partnership never acquired any right, title, or property interest therein, legal or equitable. This collateral was deposited with the bank as part of the loan transaction. Cartier never parted with the title or ownership therein. The bank held it, not as owner, but as pledgee merely. "(3) Paid-in or earned surplus and undivided profits used or employed in the business exclusive of undivided profits earned during the taxable year."

Whether this partnership used or employed in its business paid-in or earned surplus and undivided profits exclusive of undivided profits earned during the taxable year is a question of fact. The trial court found as a fact that at the beginning of the taxable year the liability of the firm exceeded its assets by the sum of $7,218.85. This court has no authority to determine the weight of the evidence. R. S. §§ 649 and 1011 (Comp. St. §§ 1587, 1672). If the finding of fact made by the trial court is sustained by some substantial evidence, then it must be accepted by this court as a final determination of the facts in issue.

There is practically no dispute in the evidence upon which the trial court made this finding of fact. It had been the custom of each partner, with the consent of the other, practically from the time the partnership was organized, to withdraw earnings of the partnership in advance of the ascertainment of the exact profits and a formal division of the same. These withdrawals were charged against the partners respectively on the partnership books of account, and whenever there was a formal division of the profits the amount due to each partner was credited to his account as against amounts that were withdrawn by him. On the 1st day of January, 1917, it appeared that Cartier had withdrawn in the aggregate, during the life of the partnership, the sum of $11,556.37, in excess of all sums credited to him. Holland had also withdrawn $18,106.28 in excess of his credits. The evidence further shows that these withdrawals were made in anticipation of a distribu-

tion of the profits, to be credited to them as against these withdrawals, that would finally balance their accounts. That this was the purpose and understanding of the partners fully appears by their testimony, and particularly the testimony of Holland, as follows:

"The Court: It would be liquidated by dividends you declared? A. Eventually.

"The Court: And credited yourself with? A. Yes."

In the absence of an express agreement to the contrary, the partnership could not require a partner to return to it his share of the actual profits anticipated by these withdrawals. The strongest inference which anything in this record would justify as to the duties of the partners to each other to repay these items charged against them is that each should repay the amount he had withdrawn in excess of his share of the profits. This would mean in the aggregate $7,218.85, just enough to pay the general debts and leave no surplus. In any event these profits were drawn by the partners and were not used in the partnership business. The claim that they were used in the partnership business as bills receivable, so they would furnish a basis of credit, is not tenable. These partners were the sole owners of the partnership business and in full control of its affairs; they were each individually liable for all the debts of the partnership, so that whether they were liable to the partnership for the full amount of these withdrawals, regardless of profits, could in no wise affect the security of creditors for the payment of their debts.

It would therefore appear that this finding of the trial court is fully sustained by substantial evidence.

Section 9 of this act provides that in the case of a trade or business having no invested capital (and, of course, that means invested capital within the meaning of the act), or not more than a nominal capital, there shall be levied, assessed, collected, and paid, in addition to the taxes under existing law and under this act, in lieu of the tax imposed by section 201, a tax equivalent to 8 per cent. of the net income. This section of the act would appear to have been intended to cover just such conditions as are here presented.

For the reasons above stated, this judgment must be reversed, and the cause remanded for a new trial in accordance with this opinion.