## EMPIRE FUEL CO. v. HAYS, Internal Revenue Collector.

(District Court, N. D. West Virginia. February 8, 1924.)

1. **Internal revenue ⬅7—Evidence held sufficient to show mining property was purchased in behalf of corporation.**

   In an action to recover additional excess profits assessed against a corporation, evidence *held* sufficient to show that mining property of the corporation was purchased on its behalf in contemplation of organization, and not in behalf of the incorporator, in whose name legal title was taken pending organization, or his associates, as individuals.

2. **Internal revenue ⬅7—In absence of fraud, price paid for property held binding on government.**

   In the absence of fraud, a fair and adequate price paid for property by a corporation was binding on the government for purpose of taxation.

3. **Internal revenue ⬅7—Corporation borrowing all its money held without "invested capital," for purposes of excess profits.**

   A mining corporation, which had borrowed all the money to purchase its property and for operating expenses, *held* to have no "invested capital," within Act Oct. 3, 1917, § 207 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅜b), and was taxable at the rate of 8 per cent of its income under section 209 (section 6336⅜j).

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Capital Invested.]

4. **Internal revenue ⬅4—Doubt in statute construed in favor of taxpayer.**

   In construing statutes levying taxes, any doubt or ambiguity is construed in favor of taxpayer.

5. **Constitutional law ⬅70(3)—Duty to interpret and enforce statute; policy for Legislature.**

   It is the duty of courts to interpret and enforce the statutes, not to inquire into the underlying policy, or their reasons or effect when enforced; the remedy for unsound statute being with the Legislature.

At Law. Action by Empire Fuel Company against S. A. Hays, Collector of Internal Revenue for the District of West Virginia. Judgment for plaintiff.

Arthur S. Dayton, of Charleston, W. Va., and Melvin G. Sperry, of Clarksburg, W. Va., for plaintiff.

T. A. Brown, U. S. Atty., of Parkersburg, W. Va., Harry H. Byrer, Sp. Asst. U. S. Atty., of Martinsburg, W. Va., and Charles A. Mapes, Sol. of Internal Revenue, and H. M. Darling, Sp. Atty. Bureau Internal Revenue, both of Washington, D. C., for defendant.

BAKER, District Judge. This is an action of trespass on the case in assumpsit, commenced on July 14, 1920, by the Empire Fuel Company, a West Virginia corporation, chartered on the 5th day of April, 1917, under the laws of the state of West Virginia, plaintiff, against S. A. Hays, United States collector of internal revenue for the district of West Virginia, defendant, to recover the sum of $35,668.23, with interest thereon from the 30th day of August, 1919, additional excess profit tax assessed against the plaintiff corporation for the year 1917, alleged to have been illegally collected by said Hays, collector, acting under the authority of the Act of Congress approved October 3, 1917,

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

commonly known as the "Excess Profit Law" (Comp. St. 1918, § 6336⅜a et seq.).

### Contentions of Parties—Plaintiff.

That the West Virginia Gas Coal Company owned a coal lease and a limited amount of equipment and a leasehold estate upon a certain coal mining property, situate in Kanawha county, W. Va., and was engaged in mining and producing coal. Desiring to sell its properties, its officers opened negotiations for that purpose with Senator Gohen C. Arnold, and the four Messrs. Hutchinson. These negotiations culminated in a contract for the sale of the properties under date of March 20, 1917, the sale to be consummated on the last day of the month—the, purchasers to be entitled to the properties from and after April 1, 1917. The contract provided that the conveyance of the properties was to be made to Arnold and the Hutchinsons, or to their nominee or nominees, as they might elect. During all the negotiations that led up to the contract, it was understood by both buyers and seller that either a corporation in existence should be the real purchaser of the properties, or that nominal purchasers would organize a corporation to acquire the properties under the contract of purchase, and to own, hold, and operate them.

After the making of this contract of purchase exigencies arose, which made it desirable on the part of the seller to convey the legal title to the properties before the time fixed in the contract of purchase, and this desire was made known to Senator Arnold, and it was arranged that a deed should be forthwith made and delivered to Senator Arnold for the properties, and, under date of March 20, 1917, such deed was executed and deposited with Union Trust Company, a banking institution of Charleston, W. Va., for the grantee and his associates. Not having anticipated taking title to the properties until the 1st day of April following, the purchasers had not organized the corporation to take title, and therefore it became necessary, for the time being, to vest the legal title, at least, in one or more of the promoters, or in some other person, for the benefit of the corporation to be organized. While the deed was made at an earlier date than contemplated by the contract, the sale was made in compliance with the original terms of the contract of purchase, as of the 1st day of April, 1917.

It was understood, in the making of the deed to Arnold on March 20, 1917, the selling company should conduct the mining operations, and all operations be paid by it up to the 1st day of April following, and that it should receive, appropriate, and own all the income, earnings, and profits from the property up until that date. So that from March 20 to April 1, 1917, Senator Arnold held the naked legal title only of the property, for the use and benefit of the seller, the West Virginia Gas Coal Company. In other words, the property was held and operated by the representative of the seller until the date of the final consummation of the sale, which, April 1 falling on Sunday, was, by virtue of West Virginia statute, on the Monday following, or April 2. On April 2, 1917, the delivery of the property to Arnold, as trustee for his associates and for the corporation in process of organization,

was in fact made, and the sale by the West Virginia Gas Coal Company became completed.

The promoters speedily completed the organization of a corporation (the Empire Fuel Company), and by deed dated April 2, 1917, but executed on the completion of the organization of said Empire Fuel Company, the plaintiff corporation, on the 21st day of April, 1917, Senator Arnold conveyed, assigned, and transferred to the plaintiff company, as of April 2, 1917, all of the mining property, estates, rights, and franchises of every kind and description whatsoever acquired from the West Virginia Gas Coal Company; the purchaser assuming all obligations incurred in the purchase of the property and in the promotion of the corporation, and all operating expenses incurred in the operation of the property from and after the date of April 2, 1917, and the Empire Fuel Company acquiring all rentals, incomes, and profits accruing upon or derived from the property from and after April 2, 1917. At no time did Senator Arnold, by virtue of any of the transactions, own or hold for himself or for his individual associates any beneficial interest whatsoever in and to the properties or any part of them; nor did he derive for himself personally, or for his associates, any profits or benefits whatsoever from the said properties, except such as he later acquired by reason of his ownership of a part of the capital stock in the plaintiff corporation, Empire Fuel Company.

The purchase price from the West Virginia Gas Coal Company was $125,000, and the assumption by the purchasers of any damages that might be recovered by Jewett-Bigelow and Brooks against the West Virginia Gas Coal Company in excess of $10,000, as stipulated in said contract. Senator Arnold and his associates borrowed $41,000 to make the cash payment on this property and gave notes aggregating $84,000. Later, in order to provide working capital, there was borrowed $50,-000, which was used to pay the $41,000 original cash payment, and the residue to be used to provide working capital. In addition, Senator Arnold personally advanced the discount on the notes of the Pittsburgh Bank and the Empire National Bank, amounting to something over $1,200, and some other minor sums were advanced. It is admitted that these debts were assumed by plaintiff, Empire Fuel Company.

The plaintiff commenced its corporate existence with an indebtedness of $84,000 to Mason Crickard, trustee for the West Virginia Gas Coal Company, its own notes having been substituted for those of Senator Arnold and others; also with indebtedness to the Empire National Bank of $25,000, and a like indebtedness of $25,000 to the Bank of Pittsburgh, and an indebtedness of something over $1,200 to Arnold for discount, etc., advanced. Senator Arnold, in purchasing the property of the West Virginia Gas Coal Company, was acting for the benefit of the plaintiff company in contemplation of its organization, and under the rule of "qui facit per alium facit per se" plaintiff company, in effect, purchased this property and borrowed all the purchase money and all of the money for its working capital and corporate organization, and, all of said sums having been borrowed, the corporation had no invested capital, within the meaning of the Act of October 3, 1917,

and was taxable at the rate of 8 per cent. under the terms of section 209 of said law.

### Defendant.

First. That Arnold, in purchasing the West Virginia Gas Coal Company property, was acting, not on behalf of the corporation in contemplation, but on behalf of himself and the four Hutchinsons, his associates.

Second. That the property conveyed by Arnold to the corporation had a value in excess of $125,000, the amount paid for it, and therefore this excess constituted invested capital.

Third. That the plaintiff had actual cash paid in for the incorporators' shares, and that such cash paid in constituted invested capital.

Fourth. That upon the theory that Arnold was not acting for the corporation, but acting for his associates, the indebtedness was not borrowed money within the meaning of the Act of October 3, 1917, but was the indebtedness of Arnold and his associates, and, as a corollary to this contention, that the fact that these persons indorsed the notes of the corporation when given placed them in the position of extending their credit to the corporation, and this credit constituted invested capital.

Fifth. That the property conveyed by Arnold to the plaintiff corporation was of substantial value and was "working capital," and that therefore, the plaintiff being a corporation ordinarily employing capital, it did not come within the purview of section 209 which applied only to corporations in the nature of personal service corporations.

[1, 2] An analysis of this record shows the case to turn upon the decision of two outstanding questions of fact, to wit:

### Questions of Fact.

First. Was Senator Arnold acting, in his purchase on behalf of the plaintiff, in contemplation of its organization, or on behalf of himself and his associates as individuals?

Second. The value of the property purchased.

The court is inclined to the view from the record that Senator Arnold, in purchasing the property, was acting on behalf of the plaintiff corporation then in contemplation and speedily organized; that the property was acquired in the usual course of business at a bona fide sale at the price of $125,000, and from all the evidence taken and produced in this case the sum stated in the contract of March 20, 1917, was a fair and adequate price therefor, and in the absence of fraud the government is bound by it for the purpose of taxation.

The plaintiff corporation borrowed every cent of this sum and $9,000 additional for operating expenses and some $1,200 advanced by Senator Arnold to pay interest. The small sums paid in on account of stock were at once extinguished for expenses.

### Question of Law.

[3] The legal question is whether the plaintiff corporation, under a finding of this state of facts, had "invested capital" as contemplated by the Revenue Law.

[4] Courts, in considering cases of this nature, will, so far as they can within bounds of reason, resolve every doubt, giving every reasonable inference, interpreting every statutory ambiguity, in favor of the taxpayer. Partington v. Attorney General, L. R. 4 H. L. 100, 122; U. S. v. Wigglesworth, 2 Story, 369, Fed. Cas. No. 16,690; Net & Twine Co. v. Worthington, 144 U. S. 474, 12 Sup. Ct. 55, 35 L. Ed. 821; U. S. v. Isham, 17 Wall. 496, 21 L. Ed. 728; Rice v. U. S. (C. C. A. 8th Ct.) 53 Fed. 910 (911, 912, of the opinion), 4 C. C. A. 104; Plumer v. Commonwealth, 3 Gratt. 645; Gould v. Gould, 245 U. S. 151, 153, 38 Sup. Ct. 53, 62 L. Ed. 211; Knowlton v. Moore, 178 U. S. 42, 20 Sup. Ct. 747, 44 L. Ed. 969; State of Ohio v. Harris, 229 Fed. 892, 898, 144 C. C. A. 174; U. S. v. Coulby (C. C. A. 6th Ct.) 258 Fed. 28, 169 C. C. A. 165; Miller v. Gearin (C. C. A. 9th Ct.) 258 Fed. 225, 169 C. C. A. 293 (syllabus 1 and 2).

Similar authorities could be multiplied indefinitely, but the very recent decision of the Supreme Court of the United States renders their further consideration unnecessary. The case of Gould v. Gould lays down most emphatically that in cases of doubt the construction must be most strongly against the government, as the following language from this decision will show:

"In the interpretation of statutes levying taxes, it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen." Gould v. Gould, 245 U. S. 153, 38 Sup. Ct. 53, 62 L. Ed. 211.

It is obvious, irrespective of the rules of interpretation, that courts are not concerned in the policy or reason behind the statute, if the words are clear or may be reasonably resolved in favor of the taxpayer. The statute excludes borrowed money from computation as invested capital, and therefore a corporation whose capital is all borrowed has no invested capital and must be taxed under section 209.

These are clear-cut, definitive, and decisive words of the statute, and are subject to no doubt or ambiguity. Therefore it must follow that the Empire Fuel Company, if all of its money was borrowed, must be taxed under section 209. A cursory glance at the situation might give rise to the thought that section 209 creates a certain favoritism in favor of certain corporations. It might be said, if the question were considered superficially, that those desiring to form a corporation may borrow all the money for the very purpose of avoiding the higher graduate tax, and that therefore section 209 furnished a loophole of escape from the higher tax. An examination, however, of this position clearly shows its fallacy.

First. In the instant case there could be no question of evading the higher tax, or of using section 209 as a vehicle to escape taxation, because all of the transactions involved in this case happened long before October 3, 1917, the date of the approval of the act, and long before section 209 was conceived in the brain of its author.

Second. Even if section 209 did furnish a loophole for the escapement of higher tax in the case of certain corporations, it would be im-

proper for the court to consider such fact, because the language of section 207, excluding money or property borrowed from computation as invested capital, is equally clear, and in such case a court can proceed no further.

[5] It is the duty of courts to interpret and enforce the statutes, not to inquire into their underlying policy, their reasons, or their effect when enforced. It a statute is unsound in its operation, the remedy is with the Legislature, and not with the judiciary. Courts have no power to suspend the operation of a statute, even though that operation might furnish an advantage to one citizen as against another, provided the statute is constitutional. To ask a court to withhold the operation of section 209, taken in connection with the excluding limitation of section 207, would be to ask the court not to interpret the statute, but to change the policy of the statute and to override it.

The case of La Belle Iron Works v. U. S., decided by the Supreme Court May 16, 1921, reported in 256 U. S. 377, 41 Sup. Ct. 528, 65 L. Ed. 998, is determinative of many of the contentions of the government in the instant case and so well show their fallacy. After a careful study and full consideration of this case, I am driven to the conclusion that the government's position is not only contrary to the decisions of the Supreme Court of the United States and the Circuit Court of Appeals, but also to the pronouncements of the Department of Internal Revenue on this subject. Treasury Decision No. 3220, approved August 6, 1921; Bulletin 49–21, issued December 7, 1921, p. 36; Cartier v. Doyle (C. C. A.) 277 Fed. 150.

In view of the reasons above stated, and in the light of the principles of law herein set forth, the Court finds for the plaintiff and an order may be prepared for judgment accordingly. The record contains considerable evidence adduced at the trial, which was had by the court in lieu of a jury, the admission of which was subject to reservations by the court. If desired, the final order may show the exclusion of such parts of the evidence as were admitted on the theories which have been rejected. The order may also show, if desired, the court's findings as indicated in the memoranda, instead of the special findings requested.