Appeal of **CLARENCE WHYBROW**.          **Docket No. 609.**

An individual interior decorator having a library and some cash, *held* to be engaged in a "trade or business having no invested capital," and hence taxable in 1917 under section 209 of the revenue act of 1917.

Submitted February 28, 1925; decided March 9, 1925.

*Ferdinand Tannenbaum, Esq.*, for the taxpayer.

*Edward C. Lake, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

The taxpayer contends that for the calendar year 1917 he was within the provisions of section 209 of the revenue act of 1917. He testified at the hearing and, for the purpose of clarifying his testimony and enabling the board to visualize the conduct of his business, he exhibited a typical display of articles and materials such as tapestries, hangings, sketches, moldings, panels, etc. These articles were not introduced in evidence but were for purposes of illustration.

#### FINDINGS OF FACT.

The taxpayer is an interior decorator and household furnisher. For several years, including the year 1917, his business has been conducted in a studio, consisting of one room on the fifth floor of the building at 340 Madison Avenue, New York. In this studio he has a substantial library, including sketches. The studio also contains a number of models and samples, such as small pieces of molding or cornice or paneling, pieces of draperies, tapestries, chair coverings, and other similar materials. There are also articles of furniture such as chairs and tables. These models, samples, and other pieces are not owned by the taxpayer, but are loaned to him from time to time by manufacturers and dealers for use by him as samples in securing contracts for interior decorating and furnishing.

The business is done upon contract. The prospective client comes to the taxpayer's studio to discuss a proposed contract and leaves with the taxpayer the blue prints and other description of the premises. The taxpayer considers the project, uses his library for personal research in developing his ideas and, after he has determined upon the style and period in which the proposed contract is to be fulfilled, borrows the necessary materials from dealers and sets them up in his studio, so as to give the owner an illustration of how his place will appear after the contract is fulfilled. He also has sketches prepared of various aspects of the proposed interior, taking for example a wall with a fireplace so as to show how the fireplace can be improved and the wall paneled or otherwise decorated. Supplementing this he exhibits to the owner samples of the paneling and cornices which he has borrowed.

His library consists of books upon the subject of his business. Many of them are large books with photographs or sketches of well known English interiors and others of Italian and French. Some of these books are worth as much as $50 each. The library contains

about 400 volumes, and, including sketches, is worth, as he testified, approximately 85 per cent of an amount shown on his return as $19,445.13. The value of the library and sketches is therefore in the neighborhood of $16,500. The library and sketches are practically all that the taxpayer owns in the studio, all of the models and samples being loaned.

A typical contract job, as described by the taxpayer, was one in which the taxpayer undertook to redecorate and furnish the entire first and second floors of a client's house. The gross amount to be received by the taxpayer was $27,000, which was figured so as to approximate a 10 per cent profit to him on a cost plus basis. After he secured the contract in the manner above described, he made several subcontracts with others to do the work and supply the furnishings. He paid nothing except from amounts advanced by the client on account of the contract price. When the contract was signed the client advanced $5,000. With this the taxpayer was able to go out and buy paint and other materials for the work, and also make the necessary subcontracts. From time to time the client would make further advances and with these the taxpayer discharged his financial obligations to the subcontractors and workers. The work was completed in about four months, at the end of which time the taxpayer received the final payment of about $2,500, which was the approximate amount of his profit.

His understanding with the subcontractors is that they are to receive their pay from the amounts which he receives from the client, and if his collection from the client is delayed they must wait. He does not advance any money to the subcontractors and pays nothing except out of the amounts received from the client. The taxpayer is solely responsible to the client and superintends all of the work. The subcontractors in many cases do not know who the owner is. The dealers who sell him furniture and other materials understand that he is purchasing them for the owner, who is sometimes unknown to the dealer. He never bought from the dealers on credit but always received the money from the owner before he paid. They never billed him for the samples or models loaned, but after they were delivered to the owner they were billed to the taxpayer.

He never put any capital into the business. When he began in 1904 he had about $2,000, which he used entirely for family purposes and did not use for the business.

Upon his 1917 excess profits tax return he showed a net income of $43,636.29, which was derived entirely from contracts as above described. He employed a salesman upon commission who financed himself, paid all of his traveling expenses and received 10 per cent of the profit from the contracts which he secured in the name of the taxpayer. The gross sales in 1917 were approximately $178,370.25, and the purchases approximately $105,512.90. He had on hand cash amounting to $16,070.91, most of which constituted advances by clients for use in the performance of existing contracts. On January 1, 1917, he probably owned less than $5,000 of assets, excluding his library and sketches. He had accounts receivable of $7,553.77, due under existing contracts, and accounts payable of $11,480.33, due to subcontractors on orders of 30, 60, and 90 days delivery.

### DECISION.

The deficiency determined by the Commissioner is disallowed.

### OPINION.

STERNHAGEN: Clarence Whybrow was an artist. His work was done on inspiration and his product was beauty. He concerned himself with color, line, balance, harmony, and proportion. His task was to catch the grandeur of the Louis', the grace of the brothers Adam, or the charm of the classic Florentine, and install it behind a high brownstone stoop on Madison Avenue in place of its Victorian glass and gold. He thought not of quantity or of production or of unit costs. Success to him was in quality and effect. He bought paint, of course, and other materials for his art—so did Leonardo and Rembrandt—and sold the product, as did Chippendale and Whistler.

Then came the war and the burdens of government, and his place must be found in the profits tax of 1917. He knew little of such matters then, and hardly more when he testified seven years later. Accounts irked him. He was successful enough to have a book-keeper and this man made the tax return which Whybrow signed. What it contained he hardly knew. It was based upon the assumption that his business was one " having no invested capital or not more than a nominal capital," as provided in section 209. But the Commissioner found in his return that he had business assets and liabilities—he had a studio containing models and a library of many fine books and pictures, he had accounts receivable and payable, and he had cash in the bank—and he was therefore regarded as conducting a trade or business having capital to be used as the basis for measuring war profits.

In this we must disagree. This man's business was in his soul. He could have carried it on anywhere and without a cent. The only investment he had was in the library, and it is questionable whether this is to be regarded more as a business asset or as a personal collection. To be sure, he used it in his work, but only to supplement his ideas. Whether it was productive or what it produced no one can say. It may be doubted whether he would have paid it in for stock or shares if he had incorporated. Are a lawyer's books, a doctor's surgery, an architect's sketches and snapshots, or an engineer's tables and formulae his capital? It was apparently not so regarded by the sponsors of section 209 in Congress, for both Senator Simmons and Representative Kitchin said that the section was expressly designed to provide for lawyers, doctors, engineers, and their like. And the courts have applied the section even more freely than this by including commission merchants, *Porter* v. *Lederer*, 267 Fed. 739; selling agents who purchased for themselves and resold, *Cartier* v. *Doyle*, 277 Fed. 150; *R. H. Martin, Inc.* v. *Edwards*, 293 Fed. 258; licensors of patents, *DeLaski & Thropp Co.* v. *Iredell*, 268 Fed. 377; and a mining corporation whose organizer borrowed the money for its original capital, *Empire Fuel Co.* v. *Hays*, 295 Fed. 704; while excluding corporations which sold stock for cash, *Alworth-Stephens Co.* v. *Lynch*, 278 Fed. 959; and issued stock for a secret process and

machinery. *Lincoln Chemical Co.* v. *Edwards*, 272 Fed. 142; 289 Fed. 458.

That the section is difficult to construe and apply can not be doubted. Clearly, since the qualifications are in the disjunctive, the taxpayer must prove either that he has no invested capital in the statutory sense or that he has only a nominal capital in the non-statutory sense. We think this taxpayer has no invested capital within the intendment of the statute. The cash he had was almost all advances from his patrons, held by him, as he said, " in trust " till the completion of their contracts. He used neither capital nor credit, but paid his obligations out of and after his receipts. His samples were loaned to him without security. His only permanent asset was his library, and this we can not regard as capital. The amount of his gross income including, as it apparently does, amounts advanced by patrons, is not significant.

Section 209 should be applied.