APPEAL OF W. S. BOGLE & CO., INC., ESSANBEE MINES CO., PINE RIDGE MINES CO., RETLAW MINES CO., AND CRESCENT COAL & MINING CO.

Docket No. 2208.   Decided November 16, 1926.

1. Certain coal leases paid in for stock *held* to have had **no** actual cash value in excess of the stipulated royalties.

2. The reduction of invested capital on account of insufficient depletion taken in prior years, and the reduction of surplus of the consolidated group in the amount of the deficit of certain subsidiaries, approved.

3. The evidence is not sufficient to show that the Commissioner's determination of reasonable compensation for the year 1917 was erroneous.

*M. F. Gallagher, Esq.*, and *E. B. Wilkinson, Esq.*, for the petitioners.

*Benjamin H. Saunders, Esq.*, for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits taxes for the years 1917 and 1918 in the amount of $13,331.60.

### FINDINGS OF FACT.

Petitioners were, during the years here involved, affiliated corporations, all of the stock, with the exception of a few shares, being held by Walter S. Bogle. Their principal office is located at 116 N. La Salle St., Chicago, Ill.

The Essanbee Mines Co. was organized under the laws of Indiana in November, 1913, with authorized capital stock of $250,000 par value. With the exception of four qualifying shares this stock was issued to Walter S. Bogle for property having an actual cash value of $300,000. This property consisted of 1,390.5 acres of coal land, 39 acres of surface land, and certain mine equipment and supplies. It was located in the West Clinton coal field in Vermillion County, Ind., on the Chicago, Terre Haute & Southeastern Railway, 160 miles from Chicago. It had the advantage of being nearer Chicago and the steel manufacturing district than any other property in the field. The land contained three seams of bituminous coal, graded as Nos. 3, 4, and 5. Grades 3 and 5 were steam coal, No. 5 being used to a certain extent for domestic purposes. The coal in No. 4 seam was of a better grade, and was used for more varied purposes than the coal from the other seams. At the time the property was acquired there was a completed mine to the No. 5 seam and a partially completed mine to No. 4. A switch from the railroad to the mouth of the mine had been previously constructed.

Immediately after organization the Essanbee Mines Co. leased this property to Walter S. Bogle for a period of twenty years. The lease provided for the payment of a royalty of 5 cents for each ton of coal mined and a minimum royalty of $1,666.67 per month. The lessor was required to complete the mine to the No. 4 seam of coal. There was also a provision that if the lessor should at any time during the period of the lease desire to sell the premises, it should

have the right to cancel the lease upon payment to the lessee of a sum not exceeding $50,000.

On or about February 5, 1914, W. S. Bogle & Co. Inc., was organized for the purpose of taking over the lease above mentioned and operating the mines thereunder. This corporation was organized under the laws of Indiana and its authorized capital stock had a par value of $100,000. Stock was issued to Walter S. Bogle for the lease, which was entered on the books of the corporation at a value of $42,400. At the time this corporation was organized the coal business was, and for some time previous thereto had been, generally dull.

In 1917, after the Fuel Administration had issued regulations permitting a profit of 15 cents per ton to companies engaged solely in the business of selling coal, it was mutually agreed between the parties that the lease mentioned should be canceled and that the Essanbee Mines Co. should operate the mines and W. S. Bogle & Co., Inc., should sell the output, thereby enabling the former to make a profit from operation and the latter the profit allowed to selling companies. The Essanbee Mines Co. purchased the mine equipment and supplies from W. S. Bogle & Co., Inc., at cost, but no payment was exacted for the cancellation of the lease.

The Pine Ridge Mines Co., also an Indiana corporation, was organized July 25, 1917, with authorized capital stock of $50,000 par value. This stock was issued to Walter S. Bogle for an option to lease 800 acres of coal land and to purchase a mine and equipment located thereon, the lease to require payment of a royalty of 5 cents on each ton of coal mined and the purchase price of the mine and equipment to be $138,000. Bogle had procured this option from W. S. Bogle & Co., Inc., for a payment of $10. W. S. Bogle & Co., Inc., had previously leased 400 acres of the property at a royalty of 3 cents per ton from the Higgins Martin Coal Co. and had purchased the mine and equipment from the same company for $131,500. W. S. Bogle & Co., Inc., originally agreed to pay $175,000 for the mine and equipment, but because of certain contracts of the Higgins Martin Coal Co., which it was required to assume, the price was reduced. The remaining 400 acres had been obtained from J. J. Higgins under a lease likewise providing a royalty of 3 cents per ton. This tract was located adjacent to that procured from the Higgins Martin Coal Co. and could be reached through the mine located on that tract. The Pine Ridge Mines Co. exercised the option, thereby acquiring the lease and purchasing the mine and equipment for a payment of $138,000.

The Pine Ridge property was located in Vigo County, Ind., about eight miles south of the holdings of the Essanbee Mines Co. The

lease under which it was held provided that the mine could be used in developing adjoining acreage if the lessee so desired. At the time this property was acquired the coal market was very active.

The Retlaw Mines Co. was incorporated under the laws of Indiana in February, 1910. Its capital stock was issued to Walter S. Bogle for a coal mine, 300 acres of surface and 800 acres of coal land located in Vigo County, Ind. The company assumed certain liabilities that were outstanding against the property at that time. The mine was operated for only a year or two before it was abandoned. Soon afterwards, in 1913, the ground works of the mine were partially destroyed by fire. They were not replaced and the mine has not been operated at any time since. On January 1, 1917, the company had capital stock outstanding in the amount of $30,000 and a deficit in the amount of $78,498.88. In 1919 the surface land and the buildings thereon were sold for $11,700. During the years 1914 to 1918, inclusive, interest on the bond issue of the Retlaw Mines Co. was paid by Walter S. Bogle.

The Crescent Coal & Mining Co. was organized under the laws of Illinois. Its business was that of selling agent and jobber in bituminous coal. Active conduct of business was discontinued about 1912. On January 1, 1917, the company had capital stock outstanding in the amount of $38,300 and an accrued deficit of $15,389.43. In 1917 the assets of the company as shown on the books were: Cash, $519.84; accounts receivable, $4,068.41; notes receivable, $15,202.47, and real estate, carried under the name of Walter S. Bogle, trustee, $6,592.17.

In 1916 the Retlaw Mines Co. was indebted to the Crescent Coal & Mining Co. in the sum of $45,902.48, for cash advanced in previous years. In that year Walter S. Bogle assumed this indebtedness and surrendered to the Crescent Coal & Mining Co. capital stock of that company in the amount of the debt. The amount of this indebtedness constituted a part of the deficit shown on the books of the Retlaw Mines Co. as of January 1, 1917.

During the years 1915 and 1916 the Essanbee Mines Co. paid to Walter S. Bogle, its president, a salary of $3,500 a year. In 1917 a resolution was adopted by the board of directors increasing his salary to $10,000 a year and authorizing the payment of $7,000 as additional compensation for services rendered in 1915 and 1916. The full amount, $17,000, was paid in 1917 and deducted as an expense on the return of the corporation for that year.

For the years 1917, 1918, 1919 and prior years, the Essanbee Mines Co. charged off depletion at the rate of 1.39 cents per ton. Its returns were filed on that basis. The parties agree that the correct rate of depletion on the Essanbee Mines Co. properties is 1.765

cents per ton. The Commissioner has used this rate in determining the deduction allowable for the taxable years on account of depletion and has adjusted invested capital by applying the same rate for prior years.

W. S. Bogle & Co., Inc., has exhausted the lease to the Essanbee Mines Co. property at the rate of 10 per cent, on the ground that the coal would be exhausted at the end of ten years. In 1917, when the lease was canceled, it sought to charge off the remaining value shown on its books as a loss. This was refused by the Commissioner and the company has continued to take exhaustion at the rate of 10 per cent per annum.

It is admitted on behalf of the Commissioner that, through clerical error, the invested capital of W. S. Bogle & Co., Inc., for 1917 was erroneously reduced in the amount of $7,600; that the correct amount of depreciation allowable to W. S. Bogle & Co., Inc., for 1917, on its physical assets, is $4,885.52; and that the proper allowance for the depletion for 1918 of certain coal lands owned in fee by W. S. Bogle & Co., Inc., and leased to the Pine Ridge Co., is $143.43.

The return filed by W. S. Bogle & Co., Inc., for the year 1919 disclosed a net loss of $12,753.68. The Commissioner has reduced this loss to $4,708.45, the amounts disallowed consisting of $4,240 representing deduction on account of exhaustion of the lease to the property of the Essanbee Mines Co., $3,537.23 paid as minimum royalties, and $268 representing cost of preparing abstracts on property owned by the company. The Pine Ridge Mines Co. reported a net loss for the same year of $2,491.51, of which amount $1,274.42 represented exhaustion claimed of its leasehold and $1,277.09 represented development charge. The petitioner has acquiesced in the disallowance of the latter amount. The Essanbee Mines Co. also reported a net loss for 1919, of which the Commissioner has disallowed $3,225 deducted on account of minimum royalties paid under leases to certain property being operated by the corporation.

OPINION.

LITTLETON: The issue presented for determination by this appeal grew out of alleged errors of the Commissioner—(1) in determining the value for invested capital and depreciation purposes of the lease acquired by W. S. Bogle & Co., Inc., in exchange for its capital stock; (2) in determining the value for invested capital purposes of an option to lease the Pine Ridge Coal properties and to purchase the mine and equipment thereon, procured by the Pine Ridge Mines Co. in exchange for its capital stock; also the cost of the lease acquired by the exercise of the option for the purpose of computing the deduction for the exhaustion thereof; (3) in exclud-

ing from consolidated invested capital amounts representing the outstanding capital stock of the Crescent Coal & Mining Co. and of the Retlaw Mines Co.; (4) in reducing consolidated invested capital by applying the deficits of the Crescent Coal & Mining Co. and the Retlaw Mines Co. against the surplus of the consolidated group; also in determining the amount of the deficit of the Retlaw Mines Co.; (5) in reducing invested capital by adjustment of depletion of the Essanbee Mines Co. for prior years; (6) in disallowing the deduction for 1917 for salary paid in that year by the Essanbee Mines Co. on account of services rendered in 1915 and 1916, and in excluding that amount from invested capital for 1917; (7) in excluding from invested capital as of January 1, 1918, the amount of income and excess-profits taxes for the year 1917 assessed and collected subsequent to 1918; (8) in reducing the net loss for 1919 by disallowing deductions made by W. S. Bogle & Co., Inc., and Essanbee Mines Co. for minimum royalties paid during that year, deductions made on account of the exhaustion of the W. S. Bogle & Co. lease, and the lease of the Pine Ridge Mines Co.; also deductions made representing the cost of preparing abstracts on land owned by W. S. Bogle & Co., Inc.

There are other items which, on agreement of counsel at the hearing, are not now in dispute or which have been determined as facts and need only to be mentioned here. It has been admitted on behalf of the Commissioner that through clerical error the invested capital of W. S. Bogle & Co., Inc., was erronously reduced in the amount of $7,600. It is agreed that, with the exception of the leasehold, the proper allowance for depreciation of assets to that corporation for 1917 is $4,885.52. It is also entitled to a deduction in the amount of $143.43 for depletion of certain coal lands owned by it in fee and leased to the Pine Ridge Mines Co. It is also agreed between counsel that the proper rate of depletion allowable to the Essanbee Mines Co. on its coal mining property is 1.765 cents per ton, instead of 1.39 cents per ton as used by the petitioner in computing the deduction therefor on its 1917, 1918 and 1919 returns. The deductions for those years should be increased accordingly.

With reference to the first of the issues enumerated above, we are of the opinion that the Commissioner properly excluded from invested capital the amount purporting to be the value of the lease acquired by W. S. Bogle & Co., Inc., from Walter S. Bogle, in exchange for its capital stock. The petitioners contend that the lease had a value of at least $50,000 and that the Commissioner erred in eliminating from invested capital $42,400, the amount at which the lease was carried on the books of the corporation. This lease was acquired by Walter S. Bogle from the Essanbee Mines Co. without cost and was assigned without change to W. S. Bogle & Co., Inc., for

stock. In support of their contention as to the value of the leasehold, the petitioners presented three witnesses who expressed as their opinion that the lease was worth $50,000 or more. Two of the witnesses had been employed in connection with the development of the properties, one having been engaged in gathering together the acreage prior to the time it was acquired by the Essanbee Mines Co. The third witness owned coal lands a few miles south of the property in question and for a number of years operated these properties. Testimony was given to the effect that the property was conveniently located with reference to market, that the coal was excellent both as to the quality and quantity, that a mine to one coal seam had been completed and another had been partially completed, and finally that the equipment was of high grade and new.

There is no question that such features as those enumerated tend to make the lease attractive, but there is nothing to show that all of these features were not fully considered and covered when the lease was negotiated, and that the royalty of 5 cents per ton and the minimum royalty did not fully cover all of these items. There is nothing in the record which indicates that Walter S. Bogle procured, by way of the lease, more than he was obligated to pay as royalties, or that his prospects for profits could be based on anything other than operation of the mines. Furthermore, granting that the lease, under ordinary circumstances, was very attractive, all conditions existing at the time must be considered in determining the value, and it appears that the coal business was and for some time had been very dull. On the evidence before us, we are not justified in saying that the lease in question had the value claimed by the petitioners or that it in fact had any value over and above the amounts paid annually by way of royalties.

Our conclusions in respect of the value, for invested capital purposes, of the lease mentioned will also dispose of the question as to whether or not the deductions claimed on account of the exhaustion of the lease should be allowed. Since nothing of value was given for the stock, the corporation had nothing on account of which exhaustion could be claimed. The same reasoning also disposes of the petitioner's claim for deduction as a loss of the remaining value of the lease as shown by the books of the corporation at the time it was canceled. With reference to the last item, however, there is some question as to whether or not such a deduction would be allowable, even though it be conceded that the lease, at the time it was paid in for stock, had the value contended for by the petitioner. It is stated that it was mutually advantageous to both parties to cancel the lease. It is also well to note that under its provisions the lease could be canceled only in case the lessor desired to sell, and then only upon pay-

ment of $50,000 to the lessee. This payment was not exacted. Taking all these facts into consideration, it would be very strange reasoning which would permit a deduction on account of loss when it is admitted by the parties themselves that it was mutually advantageous to cancel the lease. Furthermore, if there was a loss on the part of the lessee, it had only to enforce the provisions of its contract in order to be fully indemnified against such loss.

In the case of the Pine Ridge Mines Co., the value of the option received for stock, or of the lease procured by exercise of the option, is immaterial so far as the determination of invested capital is concerned. This transaction falls within the provisions of section 208 of the Revenue Act of 1917 and section 331 of the Revenue Act of 1918, which provide that if property is paid in for stock after March 3, 1917, such property shall have, for invested capital purposes, no greater value than would have been allowed in computing the invested capital of the grantor, provided the same party or interests controlled 50 per cent or more of the stock of the corporation. In this case the option was paid in for all of the capital stock of the corporation in July, 1917, and inasmuch as the option was originally obtained by Walter S. Bogle for a payment of $10, it can have no greater value for invested capital purposes in the case of the Pine Ridge Mines Co. than it would have had if Walter S. Bogle had retained it.

The option acquired by the Pine Ridge Mines Co. in exchange for its capital stock was entered on the books of the corporation at a value of $50,000, which value was also attributed to the lease acquired by exercise of the option. The petitioner contends that this amount is the cost of the lease to the company, in that it represents the true value of the option received for stock and also represents the value of the lease at the time it was acquired. On that basis the petitioner claims that it should be allowed a proper deduction from income for the exhaustion of the said lease. W. S. Bogle & Co., Inc., from which Walter S. Bogle procured the option, and the Pine Ridge Mines Co. later acquired the lease, obtained the property by way of lease at a royalty of 3 cents per ton, and paid $131,500 for the mine and equipment. The lease to the Pine Ridge Mines Co. called for a payment of 5 cents per ton royalty and $138,000 for the mine and equipment. Three hundred of the 800 acres of coal had been removed. There was, however, this feature— that other property could be reached through the mine on the property covered by the lease and a provision permitting such operation was inserted in the lease. Testimony was also offered to the effect that, within a very short time after the lease was acquired, the Pine Ridge Mines Co. received an offer of $250,000 for the

lease, mine and equipment. The witness testifying with reference to this offer stated that he understood it to be a cash offer. Another fact which might tend to support the position of the petitioner is that, at the time the lease was acquired, the coal business was in a very prosperous condition. None of the witnesses could recall a case in which a lease in that territory had ever been sold for cash. Before giving too much consideration and weight to the offer mentioned above, it is well to note that the offer did not cover the lease alone but also included the mine and its equipment. There is nothing to show how much, if any, of the price offered was or was intended to be allocated to the lease itself; neither is there anything in the record to indicate whether or not the contracts of the Higgins-Martin Coal Co. were to be assumed by the purchaser. Under these circumstances, we do not feel that this offer alone is a sufficient basis for determining the value of the lease for exhaustion purposes, even though it be conceded that the offer was *bona fide* for cash and an indication of the value of the whole property.

The alleged error enumerated above is that the Commissioner erroneously excluded from invested capital amounts representing the outstanding capital stock of the Crescent Coal & Mining Co. and of the Retlaw Mines Co. The Retlaw Mines Co. was organized in 1910, its capital stock being issued to Walter S. Bogle for a coal mine, 300 acres of surface, and 800 acres of coal land. The operation of the mine apparently was not profitable, for it was abandoned within two or three years. Soon afterwards the top works of the mine were burned. In 1919 the surface land and remaining buildings were sold for $11,700. On January 1, 1917, this company had outstanding $30,000 capital stock, and at the same time its books disclosed a deficit of $78,498.88. The facts concerning the Crescent Coal & Mining Co. are practically the same, except that the record fails to disclose the exact date of incorporation or the nature of the property received for its capital stock. It does appear that the capital stock outstanding on January 1, 1917, was $38,300 par value and that the total assets amounted to $26,382.89. The accrued deficit on the same date was $15,389.43.

On these facts the action of the Commissioner in excluding from invested capital amounts representing the capital stock of the Crescent Coal & Mining Co. and the Retlaw Mines Co. must be approved. Section 207 of the Revenue Act of 1917 and section 326 of the Revenue Act of 1918 specifically state the items that may be included in invested capital. They include actual value of property, with certain limitations, paid in for stock, paid-in surplus, and earned surplus and undivided profits. The amounts in question can not be included as earned surplus and undivided profits because the facts show that there were accrued deficits in the case of both corporations.

There is no evidence to show that the amounts claimed represent amounts paid in for stock, paid-in surplus, or the value of property paid in for stock. The record does show that the stock of the Retlaw Mines Co. was issued for certain property, but there is no evidence which discloses the value, if any, of such property at the time it was paid in. It appears that the surface land and the buildings thereon were sold in 1919 for $11,700, but this sale can not be used as a basis for determining the value of the property in 1910, the year in which it was paid in for stock. With reference to the Crescent Coal & Mining Co., we are unable to say from the record before us that anything of value was paid in for stock of that corporation.

The petitioners also contend that the Commissioner erred in his determination of the amount of the deficit of the Retlaw Mines Co. From the facts it appears that the Retlaw Mines Co. was indebted in 1916 to the Crescent Coal & Mining Co. in the amount of $45,902.48 for cash previously advanced. Walter S. Bogle assumed the indebtedness and surrendered to the Crescent Coal & Mining Co. stock of that corporation in an amount sufficient to cancel the indebtedness. One of the witnesses testified that it was intended that the Retlaw Mines Co. should be relieved of the debt and that the payment thereof by Walter S. Bogle should operate as a gift made in behalf of the debtor company. No entry was made on the books of the corporation to that effect and, so far as its records are concerned, that amount is still carried as an obligation of the company. If Walter S. Bogle had any intention of relieving the company of that amount of indebtedness, it would have been a very simple matter to have made an entry to that effect on the books. In view of these facts, we are of the opinion that little weight should be given to the assertion of third parties, made at the present time, to the effect that a gift to the Retlaw Mines Co. was intended.

In determining consolidated invested capital, the Commissioner has applied the deficits of the companies last mentioned against the surplus of the remaining corporations of the consolidated group, thereby reducing invested capital. The petitioners contend that such procedure is improper in that it ignores corporate entities and that the invested capital of the respective corporations should be determined separately and then combined for purposes of computing the tax. The petitioners also attempt to distinguish between affiliations where the stock of one corporation is held by another corporation and affiliations where the stock of the several corporations is held by common interests.

The action of the Commissioner in reducing the surplus of the consolidated group in the amount of the deficits of the Retlaw Mines

Co. and the Crescent Coal & Mining Co. (subsidiary corporations) is approved. *Appeals of Gould Coupler Co.*, 5 B. T. A. 499; *Farmers Deposit National Bank*, 5 B. T. A. 520; *Interurban Construction Co.*, 5 B. T. A. 529; *Risdon Tool & Machine Co.*, 5 B. T. A. 530; *Ruckman Coal Co.*, 5 B. T. A. 534; *H. S. Crocker Co.*, 5 B. T. A. 537. See also *Appeal of Valdosta Grocery Co.*, 2 B. T. A. 727.

With reference to the argument of the petitioners that a distinction should be made between consolidations where the stock of one corporation is held by another and where the stock of two or more corporations is held by common interests, it is well to note that there is nothing in section 240 of the Revenue Act of 1918 on which such argument could be based. The two classes of affiliations are set forth in that section, but there is no language which in any way intimates that Congress intended that a distinction was to be made between these two groups for the purpose of computing the tax or determining the invested capital.

The Commissioner made a further reduction of invested capital because the Essanbee Mines Co. failed to take sufficient depletion for the years prior to 1917. The petitioners contend that such an adjustment for prior years is improper because of the fact that no deduction was taken by that corporation and that it has at no time received the benefit of such an adjustment. The petitioners have admitted, however, that depletion was charged off during those years at the rate of 1.39 cents per ton, whereas the proper rate is 1.765 cents per ton. In the *Appeal of Cleveland Home Brewing Co.*, 1 B. T. A. 87, we held that depreciation of tangible property charged off the books of the corporation for prior years would not be disturbed for invested capital purposes without positive evidence that depreciation actually sustained was not written off by the taxpayer. The decisions in the *Appeals of Russell Milling Co.*, 1 B. T. A. 194, and *Rub-No-More Co.*, 1 B. T. A. 228, were to the same effect. In this case, however, the facts are quite different, inasmuch as the petitioners have admitted that the depletion actually sustained was not written off on the books. Under these circumstances, there can be no question that the surplus of the petitioners should be reduced on account of inadequate depletion for the years prior to the taxable years.

The action of the Commissioner in disallowing the deduction for 1917, for salary paid by Essanbee Mines Co. to Walter S. Bogle in that year, on account of services rendered in 1915 and 1916, is approved. This case is slightly different from most of the cases that have been before us with reference to the payment of salaries on account of service rendered in prior years. We have repeatedly held

that salaries voted and paid in a subsequent year are not deductible for the years in which the services were rendered. *Sharpsville Boiler Works Co.*, 3 B. T. A. 568; *W. F. Severa Co.*, 3 B. T. A. 664; *Green Oil Soap Co.*, 3 B. T. A. 467. Since the petitioner claims the deduction in this case for the year in which the additional salary was voted and paid, it must come within the ordinary provisions governing such deductions if it is to be allowed. The petitioner has not shown that the services actually rendered during the year 1917 were such as to make the payment of the full amount, including the amount paid on account of services rendered for prior years, reasonable compensation for the year in which the salary was paid.

It is equally clear that the action of the Commissioner in reducing the invested capital of the Essanbee Mines Co. as of January 1, 1917, on account of the amount paid during 1917 for services rendered in prior years, is erroneous. There was no obligation on the part of the company to pay such an amount and no liability in regard thereto had been incurred.

The question as to whether or not income and excess-profits taxes payable for the year 1917, but assessed and collected subsequent to 1918, should be excluded from invested capital as of January 1, 1918, is governed by our opinion in the *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168, wherein we held that, under section 1207 of the Revenue Act of 1926, the action of the Commissioner in adjusting invested capital as of the beginning of the taxable year, on account of amounts payable for the preceding taxable year, should be approved. The same reasoning applies in this case.

The only question remaining for consideration is the determination of the net loss of the petitioners for the year 1919. This determination involves a consideration of three points; first, the disallowance of deductions claimed for the exhaustion of the leaseholds held by W. S. Bogle & Co., Inc., and the Pine Ridge Mines Co.; second, whether or not minimum royalties paid by the Essanbee Mines Co. and W. S. Bogle & Co., Inc., are deductible as expenses or should be carried in the capital expense account; and third, whether or not the cost of preparing abstracts on property owned by W. S. Bogle & Co., Inc., constituted capital expenditures. With reference to the first of these items, the action of the Commissioner in disallowing the deductions on account of exhaustion of the leaseholds is approved on the same basis on which the deductions claimed for the years 1917 and 1918 were disallowed. With reference to the minimum royalties, we are of the opinion that they constitute rent and are allowable deductions. It is well settled that royalties paid under the provisions of mining leases constitute rents. *Appeal of Estate of Mary E. McCahill*, 2 B. T. A. 875; *Lynch v. Alworth-Stephens Co.*

267 U. S. 364; *Von Baumbach v. Sargent Land Co.*, 242 U. S. 503; and *United States v. Biwabik Mining Co.*, 247 U. S. 116. The mere fact that the basis of computing such rents is at a rate of so much per ton, provided a certain quantity of ore or coal is removed, or is fixed at a certain, specified amount if the required quantity is not mined, does not in any way affect the nature of the payment. The cost of preparing abstracts constitutes a part of the cost of the property for which the abstracts were prepared and are not allowable deductions.

> *Order of redetermination in accordance with the foregoing findings of fact and opinion will be entered on 15 days' notice, under Rule 50.*