TYLER & HIPPACH, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 995.   Promulgated March 28, 1927.

1. Where the evidence discloses that at the time of organization
a corporation received a mixed aggregate of tangibles and intangibles in exchange for its capital stock, the stock may be apportioned
ratably with the value of each such class, and under *St. Louis
Screw Co.*, 2 B. T. A. 649, to include in invested capital so much of
intangibles as does not exceed 25 per cent of the capital stock outstanding March 3, 1917, and all the tangibles so paid in. The
remaining value of tangibles, but not the intangibles, may be included as paid-in surplus.

2. Compensation to officers expressly contracted to be a percentage annually of annual net profits, definitely calculable and a
fixed legal obligation related directly and solely to the business of
the particular year, is deductible as an accrued expense for that
year.

*J. C. Halls, Esq., H. O. Harriman, Esq.,* and *W. F. Mehrlich,
Esq.,* for the petitioner.
*A. H. Fast, Esq.,* for the respondent.

This proceeding involves deficiencies of $123.94 and $1,789.69 for
the years 1920 and 1921, and an overassessment of $1,303 for the year
1918. Several errors are alleged.

### FINDINGS OF FACT.

The petitioner is an Illinois corporation with its principal office
in Chicago. It is engaged in the jobbing of plate and window glass.
It was organized in 1898 to take over the partnership business of
Tyler & Hippach.

The partnership was organized in 1886 by Albert S. Tyler and
Louis A. Hippach with a capital of $10,000, $7,500 of which was
borrowed and later repaid out of the profits of the business. By
1890 the net worth of the partnership had increased to $40,000. By
1898 the net worth of the partnership had increased to $289,671.86,
not including any value for good will. This increase was brought
about by the earnings of the partnership which were allowed to
remain in the business. The balance sheets for the years from 1890
to 1898, except for 1894, for which no records are available, show
the net worth of the partnership at the end of each of the following
years to be as indicated:

| | | | |
|---|---|---|---|
| 1889 | $26,712.61 | 1895 | $164,726.82 |
| 1890 | 40,000.00 | 1896 | 172,045.54 |
| 1891 | 72,040.00 | 1897 | 153,747.35 |
| 1892 | 100,000.00 | 1898 | 289,671.80 |
| 1893 | 140,045.01 | | |

.The balance sheets for 1891 and 1897 contain data showing specifically the status of the partners' individual accounts as of the close of the year before adding the profits for the year. In 1891 the total in both partners' accounts before adding the profits was $37,223.55, and in 1897 it was $123,402.75. In 1898 a profit of $172,779.36 was realized.

In 1898 there were transferred to this petitioner all of the assets and liabilities of the partnership, the bill of sale specifically referring to good will as one of the assets transferred. $100,000 of the capital stock of the petitioner was issued to the partners and the excess of the value of the assets credited to the accounts of the wives of the partners and later to the partners themselves. This credit balance was still later made the basis for the issuance of additional capital stock.

Good will has never appeared as an asset on the books of either the partnership or the corporation.

The value of the good will acquired by the petitioner from the partnership was $33,333.33.

On November 30, 1918, the petitioner entered into contracts with Clinton Norris and H. A. Herrmann, the petitioner's treasurer and secretary, respectively, each of which provided:

THAT WHEREAS, second party has been in the Company's employ for a number of years and has been elected Treasurer [in the case of H. A. Herrmann, " Secretary"] of the Company, and it is desired to make provision for his compensation, for all of his services as an officer and otherwise;

Now, THEREFORE, in consideration of the premises and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

FIRST: Second party agrees to continue in the service of the Company, and the Company agrees to employ second party, for the term of five (5) years from January 1, 1918, last past. Second party shall be manager of his department as heretofore, and shall perform, substantially, the same duties as heretofore, in addition to being an officer of the Company,—all of his services, at all times, to be subject to the supervision and control of the Board of Directors of this Company.

SECOND: Second party shall give his entire time and attention and his best efforts to the Company's business and to the furtherance and success of the Company's affairs, and shall not engage in or become interested in, or render any services to any other person, business, firm or corporation than the Company without the consent, in writing, of the members of the Board of Directors.

THIRD: For his services, so to be performed under this contract, the Company agrees to pay second party a salary of Five Thousand Dollars ($5,000.) per year, beginning January 1, 1918, in convenient monthly or weekly installments, and also to pay second party, annually, a sum equivalent to Three per cent. (3%) of the annual net profits of the Company's business, said net profits to be computed after each fiscal year of the Company, as soon as income and other taxes can be estimated; the determination of the amount of the said profits, and the computation thereof, to rest solely and finally with the Board of Directors. Interest paid and depreciation shall be deducted in calculating profits. Income taxes, excess profit taxes and taxes of every other nature shall

likewise be deducted as an expense of the business from profits of the year upon the income or profits of which such taxes are levied. In calculating such profits the board of directors shall estimate the amount of taxes payable for such year and the per centum payable to the second party shall be figured tentatively on such estimate; and all settlements shall be subject to subsequent adjustments if such estimate of taxes shall prove incorrect.

The second party shall not have an interest in or to the profits of the business, but only to an amount equal to the per centum of the profits hereinbefore specified. The books of account of the Company shall be conclusively presumed to be correct in making an accounting to ascertain the profits, excepting as to specific items, the correctness of which shall be questioned upon specific grounds. Otherwise the books of the Company shall be equally binding upon both parties hereto.

FOURTH: It is further agreed that any disability of second party incapacitating him from the performance of his duties hereunder for the period, continuously, of six (6) months, or for the period of six (6) months out of any period of twelve (12) months, shall, at the option of the Company, be cause for the cancellation of this contract by the Company; and the death, insanity or permanent disability of second party shall also terminate this contract, and, in case of such termination, second party shall be entitled only to such proportionate part of his salary as shall have been earned and of the net profits as shall have been earned, and shall be payable hereunder, up to the time of such termination.

Should the stock of Albert S. Tyler or Louis A. Hippach be transferred or disposed of so that the actual ownership of the stock be changed, or should the corporation sell out its business, or its business cease, or such changes be made therein that its character shall be substantially different, then the Board of Directors shall have the right in its option to terminate this contract.

From the date of the contracts to May 28, 1924, there were credited to the drawing accounts of each of these officers, from time to time, varying amounts aggregating $42,000, and on May 28, 1924, a balance of $4,291.89 was paid to each after a final determination of the amount due.

The profits for 1918, 1919, 1920, and 1921 upon which the 3 per cent payment was computed were as follows:

| | |
|---|---|
| 1918 | $140,089.63 |
| 1919 | 153,950.00 |
| 1920 | 444,970.86 |
| 1921 | 201,462.76 |

The books of the petitioner were kept on the accrual basis.

The following is a tabulation showing the trucks acquired by petitioner prior to 1919, the dates of their acquisition, and the life of each:

| Truck No. | Year acquired. | Actual life. |
|---|---|---|
| 1 | 1910 | 10 yrs. |
| 3 | 1912 | 12 yrs., 8 mos. |
| 4 | 1913 | 10 yrs., 2 mos. |
| 5 | 1915 | Still in use. |
| 6 | 1917 | Still in use. |
| 7 | 1917 | 7 yrs., 3 mos. |
| 8 | 1918 | 5 yrs., 5 mos. |

The probable average useful life of these trucks when acquired was ten years.

The petitioner during the years involved owned six Ford coupes, which were used by its salesmen. The average useful life of these automobiles was three years and nine months.

On June 29, 1920, the petitioner purchased a tract of land improved with a two-story brick building, contiguous to its warehouse. The price paid for this property was $125,000, of which $85,000 represented the cost of the land and $40,000 represented the cost of the building.

In 1919 or 1920 the petitioner erected for use in its business a garage on property owned by it about one block and a half from its warehouse.

Under date of August 21, 1924, the respondent sent to the petitioner a letter proposing the overassessment and deficiencies noted below, and granting thirty days within which to prepare a protest against his determination. The explanatory statement accompanying this letter was as follows:

In re: Tyler & Hippach, 400 West Ohio St., Chicago, Ill.

| | Deficiency in Tax. | Overassessment. |
|---|---|---|
| 1918 | | $1, 303. 00 |
| 1919 | | 1, 578. 04 |
| 1920 | $123. 94 | |
| 1921 | 1, 789. 59 | |
| Totals | $1, 913. 53 | $2, 881. 04 |

Net overassessment $967.51.

The additional assessment of $6,454.06 for the year 1918 has been changed to an overassessment of $1,303.00 due to the fact that the Agent did not take into consideration the additional assessment of $7,757.06 made by this office.

The overassessments shown herein will be made the subject of Certificates of Overassessment which will reach you in due course through the office of the

Collector of Internal Revenue for your district and will be applied by that official in accordance with the provisions of Section 281 of the Revenue Act of 1924.

Your claim for the abatement of $7,757.06 representing part of corporation income and profits taxes for the year 1918 has been examined.

Inasmuch as the audit of your return indicates an overassessment of $1,303.00, your claim will be allowed for $1,303.00 and rejected for $6,454.06.

Your claim for the refund of $210.40 representing part of corporation income and profits taxes for the year 1920 has been examined.

Since the audit of your return for this year discloses an additional assessment of $123.94 your claim will be rejected for $210.40.

On October 10, 1924, the respondent sent a notice to the petitioner of his determination of these deficiencies and overassessments. The petitioner appealed to this Board on December 9, 1924.

OPINION.

STERNHAGEN : *Intangibles paid in for stock or shares.* The respondent in computing the petitioner's invested capital has excluded any value for intangible property paid in for stock or shares at the time of the incorporation in 1898. At that time, the evidence shows, there was a net worth of tangibles amounting to $289,671.86, which was the accumulation of earnings from the beginning of the business. Some of this consisted of inventories. The books of the partnership took no account of good will or other intangible property. When the corporation was organized, capital stock of a par value of $100,000 was issued in exchange for all the property of the business, which, as shown by the bill of sale in evidence, consisted of good will and other intangibles as well as tangible property. The petitioner at the hearing and in its brief contended that at the time of incorporation there was in fact paid in for stock or shares good will of a value not less than $33,333.33. As evidence of this, petitioner introduced the balance sheets of the partnership and a statement of the annual earnings during the period of its existence. Using these figures as a base, it computes a good will mathematically by assuming a return on the value of tangibles and capitalizing the remaining earnings upon an assumed rate to arrive at the value of intangibles. There is no evidence to indicate what, during the period in question, was a proper rate of return upon tangibles, nor is there any evidence in support of any rate for the capitalization of intangibles. However, the petitioner's rate of capitalization of intangibles is so high that it is beyond attack as to its fairness; and since, after all, the valuation of good will presents a problem that can not be solved with certainty or precision, we have, after a full consideration of such facts as are in evidence upon which the valuation can be predicated, found that the value of good will paid in to the corporation at the time of its organization is, as claimed by the petitioner, $33,333.33.

The petitioner next contends that it is entitled to the full statutory maximum value of $25,000 for such good will, since this represents 25 per cent of the capital stock outstanding on March 3, 1917. It also relies upon the Board's decision in *St. Louis Screw Co.*, 2 B. T. A. 649, in support of this contention. In this the petitioner is inconsistent. Under the *St. Louis Screw Co.* decision the petitioner is entitled to have the aggregate of its capital stock, viz, $100,000, apportioned to tangibles and intangibles ratably with the value of each class of property paid in for such capital stock. By this method and in accordance with our findings, it will be seen that $100,000 of capital stock was issued in exchange for an aggregate value of $323,005.19, consisting of $289,671.86 tangibles and $33,-333.33 intangibles. By the apportionment approved in the *St. Louis Screw Co.* case, *supra*, the $100,000 of capital stock was thus presumably issued for $10,319.75, value of intangibles, and $89,680.25, value of tangibles. Since the $10,319.75 of intangibles is less than 25 per cent of the capital stock outstanding on March 3, 1917, it may be included in its entirety. In addition to the tangibles thus regarded as paid in for stock or shares, there is, after deducting this from the total tangibles of $289,671.86 paid in at the time of organization, a remainder of $199,991.61, which may properly be included in invested capital as paid-in surplus. The net result of this will probably be merely to increase the petitioner's invested capital by the amount of $10,319.75, intangibles paid in for stock or shares, and this is less than contemplated by the petitioner in presenting its case. But this is the result of the petitioner's error in its construction of the method laid down in the *St. Louis Screw Co.* appeal and its valuation of good will at $33,333.33, the evidence being inadequate to support a greater value other than by mere mathematics.

*Contractual compensation to officers.* Under the contracts made in 1918 by the petitioner with Norris and Herrmann, the compensation to be paid to these individuals was expressly stated to be a percentage annually of the amount of annual net profits computed in a prescribed manner. The amount of such compensation was definitely calculable and was a fixed legal obligation. It was an obligation related directly and solely to the business of the particular year for which the compensation was contracted to be paid. It is a situation which in all essential respects is within the principles recognized by the Board in *Josiah Wedgwood & Sons, Ltd.*, 3 B. T. A. 355; *Block & Kohner Mercantile Co.*, 4 B. T. A. 673; and *Canton Art Metal Co.*, 6 B. T. A. 446. In accordance with these decisions the petitioner may properly deduct as accrued expenses the amount resulting from the application of the contract percentage to the net profits of the year to which it is related.

*Depreciation of automobiles.* The respondent has computed depreciation upon the petitioner's trucks and passenger automobiles at 20 per cent. The petitioner claims 10 per cent on trucks and 27 per cent on passenger automobiles. The latter were Ford coupes used by its salesmen. The trucks were used in hauling plate glass and were therefore carefully driven. They were also kept in very good repair in the petitioner's own shop. The evidence upon this question of fact establishes that the probable useful life of the trucks was ten years, and of the Ford coupes was three years and nine months, and we therefore hold that the proper rate of depreciation upon the trucks is 10 per cent, and upon the Ford coupes is 27 per cent. The decision on this point will affect both income and invested capital.

*Basis for depreciation of brick building.* The petitioner, on June 29, 1920, paid $125,000 for a lot on Ohio Street, upon which stood a two-story brick building. The respondent in computing depreciation of the building has used as a base the amount of $15,000 which is treated as the amount of the purchase price properly allocable to the building. The petitioner's evidence as to the proportionate cost of the building varies from $35,000 to $45,000, the lower figure being that of one of the officers of the corporation and the higher figure being that of the real estate dealer who negotiated the transaction. None of the evidence conclusively demonstrates any definite allocation, but from such evidence as the record contains we find the cost of the building to have been $40,000.

*Depreciation and obsolescence of garage.* The respondent has allowed 2½ per cent depreciation and obsolescence upon the garage built in 1919 or 1920. The petitioner claims a rate of 10 per cent and seeks to support this by testimony that the garage building is not suitable for the land by reason of the land's rapid increase in value. The evidence, however, is too slight and conjectural. We sustain the Commissioner.

*Jurisdiction as to 1918 determination.* The evidence shows that an assessment for 1918 was made and that claim for abatement thereof was by determination of August 21, 1924, allowed in part and rejected in part. This brings the matter within section 283 (f), Revenue Act of 1926, and the Board has jurisdiction. *Elizabeth W. Stranahan,* 4 B. T. A. 1141.

> *Judgment will be entered on 20 days' notice, under Rule 50.*