SIMMONS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1927.    Promulgated October 8, 1927.

1. The value of patents for the purpose of depreciation determined.

2. A commission paid for the sale of a corporation's own stock can never serve to increase invested capital, but may reduce invested capital where the previous invested capital included earned surplus or undivided profits.

3. The Revenue Act of 1918 makes no provision for the deduction from income of the amount of the commission paid by a corporation for the sale of its own capital stock.

*Phillips Ketchum, Esq.*, and *M. G. Hastings, Esq.*, for the petitioner.

*L. L. Hight, Esq.*, for the respondent.

This is an appeal from the determination of a deficiency in income and profits taxes for the calendar years 1919 and 1920, in the amount of $222,319.71 for 1919 and $61,327.77 for 1920.

The deficiency letter is not before us, but the matter in controversy arose in this way.

On its original returns for the years 1916 to 1919, inclusive, the petitioner claimed no deduction for depreciation on its patents. Later the Commissioner allowed a certain deduction for depreciation of the patents during the taxable years; still later this deduction was disallowed. From a letter notifying it of the disallowance the petitioner appealed to this Board. The respondent in his answer urged as a proposition of law that the petitioner had an option in filing its return either to claim a deduction for depreciation of patents, thereby reducng its net income, or to make no such claim, thereby increasing its invested capital; that having chosen the latter, it is

bound by the election and can not now claim a deduction for depreciation of its patents.

This proposition was abandoned at the hearing and the only contention made by the respondent then was that the patents were not worth $1,396,468.21 and should not be valued as a group.

In regard to the stock issue, the Commissioner divided an item of $525,255, incurred by the petitioner in 1919 in connection with the issue of $7,000,000 of preferred stock in that year, and held that $315,255 of it was commission and $210,000, the balance, was a discount to the purchasers of the stock. He allowed neither amount as a deduction from income, but he did include $315,255 in invested capital, although $210,000 was excluded therefrom. An item of $250,000 incurred by the petitioner in 1917 in connection with the issue of $2,000,000 of preferred stock in that year, which stock was redeemed and retired in 1919, was similarly treated, no part was allowed as a deduction from income, $150,000 was considered as a commission and included in invested capital until August 1, 1919, when it was excluded, and $100,000 was never included in invested capital. The respondent contended that the discounts to purchasers were never capital expenses. The petitioner maintains that the entire amount expended incident to each issue should properly be deducted from income as an expense of the year of issue, that at least the part considered as a commission should be so treated, that if this is not proper then a deduction should be allowed of an aliquot amount as all or a portion of the stock retired in any year. If no deduction is ever to be allowed then the amounts should always remain in invested capital.

Certain of the facts were stipulated.

### FINDINGS OF FACT.

1. *Patents.*—The petitioner is a Delaware corporation with its principal place of business and original plant at Kenosha, Wis. It was organized in 1915.

On December 31, 1915, the petitioner acquired the assets and assumed the liabilities of the Simmons Manufacturing Co., a corporation organized under the laws of Wisconsin, in exchange for the issue of $5,000,000 par value of common stock. The balance sheet of the predecessor corporation on the date of transfer was as follows:

| Assets | Amount |
| --- | --- |
| Cash | $498, 291. 96 |
| Investments | 175, 786. 29 |
| Notes receivable | 310, 838. 15 |
| Accounts receivable | 1, 021, 120..68 |
| Fixed assets: | |
| Real Estate | 320, 711. 17 |
| Buildings and power plants | 1, 306, 359. 44 |
| Machinery and tools | 1, 135, 563. 80 |
| Furniture and fixtures | 53, 533. 73 |

|  | Amount |
|---|---|
| Inventory | $1, 506, 627. 59 |
| Patents | 1, 396, 468. 21 |
| Trade-marks | 1, 517. 03 |
| Deferred charges | 37, 404. 89 |
|  | 7, 764, 222. 94 |

LIABILITIES

|  | |
|---|---|
| Notes payable | $1, 188, 000. 00 |
| Accounts payable | 165, 174. 38 |
| Reserve for depreciation | 566, 627. 45 |
| Reserve for bad debts | 78, 684. 09 |
| Capital stock—common | 4, 000, 000. 00 |
| Surplus | 1, 765, 737. 02 |
|  | 7, 764, 222. 94 |

The only difference between the financial statements of the petitioner and the predecessor corporation at the time of the transfer was that on the petitioner's opening balance sheet the capital stock account was increased to $5,000,000 and surplus was decreased to $765,737.02.

The assets acquired and liabilities assumed by the petitioner were set up on its books at the values at which they had been carried on the books of the predecessor corporation. Among the assets acquired were 113 patents, which were then carried on the books of the predecessor corporation and of the petitioner at $1,396,468.21. They had been acquired by the predecessor corporation at or about the time of their issue and when acquired by the petitioner had an average life of slightly less than 11 years.

On the date when they were acquired by the petitioner, their remaining lives amounted in the aggregate to 14,686 months. Of these remaining months there expired in 1916, 1,356 months, in 1917, 1,284 months, in 1918, 1,283 months, in 1919, 1,233 months and in 1920, 1,196 months.

. The actual cost of these patents to the predecessor corporation has not been ascertained, due to the lack of proper records. The value at which these patents were carried on the books of the predecessor corporation was not based upon original cost.

In 1909, the directors of the predecessor corporation placed a value of $1,320,648.77 on its patents, which was $1,200,000 in excess of the value at which its patents had previously been carried on its books. In the same year a 50 per cent stock dividend, aggregating $1,200,000 par value, was declared by the predecessor corporation. This was not made in connection with the flotation of any stock to the public, and operated merely to increase the number of shares held by the small group of existing stockholders. All of the stock of the predecessor corporation at all times was closely held by the Simmons family and a few of the higher officials of the corporation.

There were no sales to the public or to anyone else at market value on or near December 31, 1915. In the years from 1909 to December 31, 1915, patents were carried on the books of the corporation at values ranging between $1,320,648.77 and $1,396,468.21.

The business of the predecessor corporation was the manufacture of iron and steel bedsteads, brass bedsteads, wire mattresses, couches and other metal goods. This business was continued by the petitioner up to December 31, 1920.

There was a marked change in the petitioner's general marketing and advertising policy in 1916, whereby its produce was sold to the public under its trade names which it widely advertised, the name " Simmons " being carried to the ultimate consumer, as contrasted with the previous practice of the predecessor corporation of selling its produce to jobbers and dealers without stamping its product.

Additional plants were acquired as follows:

January 1, 1916—Rudgear Merle Co., San Francisco, Calif.

January, 1918—Newark Spring Bed Co., Newark, N. J. (later moved to Elizabeth, N. J.).

1919—Hirsch & Spitz Co., Atlanta, Ga.

In 1918, the petitioner began to manufacture felt mattresses, hair mattresses, etc., and in 1923, it began to manufacture steel furniture.

On December 31, 1915, the business was over 17 years old and was equal in volume to that of its five largest competitors.

On January 1, 1916, the petitioner acquired the following patents from its predecessor:

| Ref. No. | U. S. patent number | Article manufactured thereunder or machine covered thereby | Date issued | Unexpired life months |
|---|---|---|---|---|
| 1 | 639222 | Spring bed and seat bottom | 12-19-99 | 12 |
| 2 | 639223 | "    "    "    "    " | 12-19-99 | 12 |
| 3 | 639224 | "    "    "    "    " | 12-19-99 | 12 |
| 4 | 639225 | "    "    "    "    " | 12-19-99 | 12 |
| 5 | 639226 | "    "    "    "    " | 12-19-99 | 12 |
| 6 | 640123 | Furniture frame | 12-26-99 | 12 |
| 7 | 688884 | Machine for making coil wire fabric | 12- 7-01 | 35 |
| 8 | 688843 | "    "    "    "    "    " | 12-17-01 | 36 |
| 9 | 693594 | Bed bottoms | 2-18-02 | 38 |
| 10 | 696865 | Die for covering tubes | 4- 1-02 | 39 |
| 11 | 700415 | Automatic break | 5-20-02 | 41 |
| 12 | 715570 | Die for covering tubes | 12- 9-02 | 47 |
| 13 | 729530 | Support for hinges or other movable members | 6- 2-03 | 53 |
| 14 | 733046 | Leaf support | 7- 7-03 | 54 |
| 15 | 140567 | "    " | 10- 6-03 | 57 |
| 16 | 36745 | Wire fabric design | 1-19-04 | 61 |
| 17 | 754142 | Leaf support for sofa beds, etc | 3- 8-04 | 62 |
| 18 | 758920 | Wire fabrics for folding beds | 5- 3-04 | 64 |
| 19 | 759515 | Spring bottoms for beds | 5-10-04 | 64 |
| 20 | 37182 | Bed spring | 10-11-04 | 69 |
| 21 | 788825 | Spring bottoms | 5- 2-05 | 76 |
| 22 | 792256 | Woven wire mattresses (Travis) | 6-13-05 | 77 |
| 23 | 796671 | Metal bed | 8- 8-05 | 79 |
| 24 | 799853 | Spring bottoms | 9-19-05 | 81 |
| 25 | 807400 | Wire fabrics | 12-12-05 | 83 |
| 26 | 810048 | Machine for making coil springs | 1-16-06 | 85 |
| 27 | 827034 | Elastic bed bottoms | 7-24-06 | 91 |
| 28 | 827035 | Bed bottom fabrics | 7-24-06 | 91 |
| 29 | 827036 | "    " | 7-24-06 | 91 |
| 30 | 849736 | Leaf supports | 4- 9-07 | 99 |
| 31 | 856298 | Wire bed bottom fabrics | 6-11-07 | 101 |

| Ref. No. | U. S. patent number | Article manufactured thereunder or machine covered thereby | Date issued | Unexpired life, months |
|---|---|---|---|---|
| 32 | 865799 | Wire bed bottom | 9-10-07 | 104 |
| 33 | 868604 | Machine for bending pipe | 2-11-08 | 109 |
| 34 | 901482 | Metal bed | 10-20-08 | 118 |
| 35 | 904611 | Wire bed bottom fabric | 11-24-08 | 119 |
| 36 | 904612 | " " " " | 11-24-08 | 119 |
| 37 | 907602 | Wire fabrics | 12-22-08 | 120 |
| 38 | 908524 | Bed springs | 1- 5-09 | 120 |
| 39 | 908911 | Process of lacquering bedsteads | 1- 5-09 | 120 |
| 40 | 914958 | Bed bottom fabric | 3- 9-09 | 122 |
| 41 | 927036 | Buffing machinery | 7- 6-09 | 126 |
| 42 | 928291 | Heating devices for lacquering beds | 7-20-09 | 127 |
| 43 | 928254 | Machines for buffing bedsteads and mounts and the like | 7-20-09 | 127 |
| 44 | 928253 | Buffing mechanisms | 7-20-09 | 127 |
| 45 | 938569 | Couch fabrics | 11- 2-09 | 130 |
| 46 | 941706 | Buffing machinery for bedstead mount | 11-30-09 | 131 |
| 47 | 943245 | Fabrics for bed couch, etc | 12-14-09 | 131 |
| 48 | 945821 | Folding couches | 1-11-10 | 132 |
| 49 | 946120 | Wire fabrics | 1-11-10 | 132 |
| 50 | 948557 | Costumers | 2- 8-10 | 133 |
| 51 | 954620 | Bed constructions | 4- 2-10 | 135 |
| 52 | 957203 | Link forming machines | 5-10-10 | 136 |
| 53 | 957199 | Machine for bending tubes | 5-10-10 | 136 |
| 54 | 957200 | Tube bending machines | 5-10-10 | 136 |
| 55 | 957202 | Bending machinery | 5-10-10 | 136 |
| 56 | 957198 | Buffing machinery | 5-10-10 | 136 |
| 57 | 957201 | " " | 5-10-10 | 136 |
| 58 | 959093 | Means for securing bedstead spindles | 5-24-10 | 137 |
| 59 | 959502 | Buffing machine | 5-31-10 | 137 |
| 60 | 960611 | Bed pillars or posts | 6- 7-10 | 137 |
| 61 | 967011 | Metallic fabric assem. machine | 8- 9-10 | 139 |
| 62 | 969104 | Locking mechanism for folding couches | 8-30-10 | 140 |
| 63 | 969105 | Locking mechanism for folding couches | 8-30-10 | 140 |
| 64 | 970713 | Wire fabrics | 9-20-10 | 141 |
| 65 | 975850 | Fabric chain machines | 11-15-10 | 142 |
| 66 | 977552 | Metal bedstead canopy frames | 12- 6-10 | 143 |
| 67 | 983664 | Tube bending machines | 2- 7-11 | 145 |
| 68 | 991806 | Bed bottom fabric | 5- 9-11 | 148 |
| 69 | 993978 | Lock seam tubes | 5-30-11 | 149 |
| 70 | 996919 | Wire fabrics | 7- 4-11 | 150 |
| 71 | 997799 | Plate metal tubing | 7-11-11 | 150 |
| 72 | 1007834 | Bending machines | 11- 7-11 | 154 |
| 73 | 1012035 | Heating devices for lacquering beds | 12-19-11 | 156 |
| 74 | 1013294 | Mattresses and bed springs | 1- 2-12 | 156 |
| 75 | 1014699 | Wire fabrics | 1-16-12 | 157 |
| 76 | 1032037 | " " | 7- 9-12 | 162 |
| 77 | 1039986 | Invisible hinge joint for wall beds | 10- 1-12 | 165 |
| 78 | 1048112 | Metallic spring structures | 12-24-12 | 168 |
| 79 | 1050873 | Folding couches | 1-21-13 | 169 |
| 80 | 1051723 | Couch fabrics | 1-28-13 | 169 |
| 81 | 1051724 | Couch fabric machinery | 1-28-13 | 169 |
| 82 | 1051468 | Spring seats | 1-28-13 | 169 |
| 83 | 1051397 | Wire link fabric | 1-28-13 | 169 |
| 84 | 1056210 | Folding chairs | 3-18-13 | 171 |
| 85 | 1058808 | Evaporators | 4-15-13 | 171 |
| 86 | 1065955 | Wire bed bottom fabric | 7- 1-13 | 174 |
| 87 | 1068075 | Machines for making wire fabric | 7-22-13 | 175 |
| 88 | 1069172 | Wire fabrics | 8-15-13 | 175 |
| 89 | 1071827 | Spring mattress frames | 9- 2-13 | 176 |
| 90 | 1080392 | Lacquering machine | 12- 2-13 | 179 |
| 91 | 1096209 | Folding couch attachments | 5-12-14 | 184 |
| 92 | 1100384 | Bed fabrics | 6-16-14 | 186 |
| 93 | 1102705 | Radiator attachments | 7- 7-14 | 186 |
| 94 | 1103028 | Spring mattress (Travis) | 7-14-14 | 186 |
| 95 | 1107214 | Satin finish machines | 8-11-14 | 187 |
| 96 | 1107215 | Automatic abradant feed for buffing machine | 8-11-14 | 187 |
| 97 | 1113736 | Faucet adapters | 10-13-14 | 189 |
| 98 | 1116859 | Spring seats | 11-10-14 | 190 |
| 99 | 1119751 | Tube-polishing machines | 12- 1-14 | 191 |
| 100 | 1126746 | Wire-working machines | 2- 2-15 | 193 |
| 101 | 1128581 | Bed fabrics | 2-16-15 | 194 |
| 102 | 1176139 | Polishing and buffing machines | 3-21-15 | 195 |
| 103 | 1135875 | Tube-bending machine | 4-13-15 | 195 |
| 104 | 1142711 | Finishing metal joints | 6- 8-15 | 197 |
| 105 | 1148767 | Link-forming machines | 8- 3-15 | 199 |
| 106 | 1148768 | Polishing machines | 8- 3-15 | 199 |
| 107 | 1148766 | Fabric-making machine | 8- 3-15 | 199 |
| 108 | 1148713 | Assembling rigs | 8- 3-15 | 199 |
| 109 | 1152889 | Machine for making wire structures | 9- 7-15 | 200 |
| 110 | 1152621 | Bed fabric | 9- 7-15 | 200 |
| 111 | 1152500 | " " | 9- 7-15 | 200 |
| 112 | 1154696 | Polishing machines | 9-15-15 | 200 |
| 113 | 1165345 | Furniture constructions | 12-21-15 | 204 |

On March 5, 1918, the petitioner acquired one patent for cash at a cost of $1,000 and on February 28, 1919, it acquired five patents for cash at a group cost of $23,021. The former had an unexpired life of 168 months and the latter had an average unexpired life of 197.8 months when acquired.

Data was submitted in evidence by stipulation which, summarized, is as follows:

| Year | Gross sales | Average yearly net earnings | Average yearly net tangible assets | Dividends | | Advertising expenditures |
|------|------------|-----------------------------|------------------------------------|-----------|---|---------------------------|
| | | | | Per share | Total payments | |
| 1911 | $4,729,268.41 | $442,154.39 | $3,268,187.20 | 3 | $108,000.00 | $35,411.09 |
| 1912 | 5,660,480.69 | 646,227.47 | 3,540,671.27 | 11.50 | 412,985.50 | 46,727.47 |
| 1913 | 6,318,632.78 | 541,283.14 | 3,794,860.73 | 8 | 306,000.00 | 52,630.30 |
| 1914 | 5,695,856.59 | 328,656.95 | 3,925,535.69 | 8 | 320,000.00 | 49,126.94 |
| 1915 | 6,549,007.56 | 746,561.74 | 4,140,177.11 | 6 | 240,000.00 | 61,933.46 |
| Average for 5 years | 5,790,769.21 | 540,976.74 | 3,733,886.40 | | | 49,165.85 |
| 1916 | 10,150,102.37 | [1] 1,713,261.81 | 5,820,062.65 | | | 181,209.69 |
| 1917 | 14,595,618.21 | [1] 2,388,965.15 | 9,205,656.05 | | | 159,354.07 |
| 1918 | 18,288,068.17 | 1,378,093.82 | 11,888,467.52 | | | 117,292.75 |
| 1919 | 19,517,776.15 | | 16,099,633.89 | | | 563,690.34 |
| 1920 | 25,540,580.41 | 1,897,515.03 | 19,817,356.12 | | | 725,589.06 |
| Average for 5 years | 16,852,266.55 | 1,948,402.67 | 12,566,235.25 | | | 349,427.18 |
| Average for 10 years | 10,821,517.88 | 1,244,689.70 | 8,150,060.82 | | | |

[1] "Average yearly net earnings," represents in each year except 1916 and 1917 the net earnings after the deduction of Federal income and profits taxes, but before the deduction of any depreciation on patents. Patent depreciation in the amount of $82,145.19 was allowed in each of the years 1916 and 1917, before the taxes were computed.

Tables showing the volume in dollars of sales of the various products and showing the percentage which the average sales of each article was of the average total sales are summarized as follows:

| Product | Percentage during period 1911–1915 | Percentage during period 1916–1920 |
|---------|-----------------------------------|-----------------------------------|
| Link springs: | | |
| Link fabric springs | 4.26 | 4.98 |
| Springs sold as part of 3-piece beds, cribs, etc | 6.26 | 17.06 |
| Loose fabrics | 1.91 | 1.53 |
| Total link springs | (12.43) | (23.57) |
| Coil springs | 7.95 | 7.41 |
| Woven wire springs | 4.98 | 1.58 |
| Slat fabric springs | | 1.03 |
| Total springs | (25.36) | (33.59) |
| Brass beds, cribs, etc | 29.64 | 10.05 |
| Iron and steel beds, cribs, etc | 41.09 | 51.25 |
| Total beds | (70.73) | (61.30) |
| Wood products | 3.63 | 3.42 |
| Mattresses and pillows | | 1.26 |
| Miscellaneous | .28 | .43 |
| Total | 100.00 | 100.00 |

Woven wire springs were gradually being superseded by wire link fabric springs during the period from 1911 to 1920. The following 28 of the 113 patents enumerated above related to the design of link

fabric springs: Nos. 16, 18, 25, 27, 28, 29, 31, 32, 35, 36, 37, 40, 45, 47, 49, 64, 68, 70, 75, 76, 80, 83, 86, 88, 92, 101, 110, and 111.

These patents did not create a monopoly, but the article produced under them had advantages over other link fabric springs in that it was easier to manufacture, took less material, and was one of the best link fabric springs made.

The following eight patents related to machines to make wire link fabric springs: Nos. 52, 61, 65, 81, 87, 100, 105, and 107.

Some of these patents were on improvements on machines covered by other earlier patents. From the group, machines were developed which produced automatically complete fabrics from the wire stock. Hand labor was only necessary to attach the fabric to the metal frame to form the complete spring. These machines effected a saving in labor, time, and material over the method formerly used by the petitioner and over the best methods used by its competitors. The petitioner, as a result, could produce its product cheaper than any competitor could manufacture its product.

Thirteen patents related to the design of coil springs. They were: Nos. 1, 2, 3, 4, 5, 19, 20, 21, 38, 74, 78, 82, and 98. The spring covered by these patents had certain advantages in strength and durability over any other then on the market and was no more expensive to manufacture than any other good coil spring. Patent No. 26 covered a machine which automatically made the unit coils from wire stock, while patent No. 109 covered a machine which automatically compressed, knotted and stacked the coils which were then assembled into a complete spring. These two machines effected a great saving of skilled labor and material over the hand method previously employed and also over the best manufacturing methods employed by competitors.

The patents on the design of woven wire springs were: Nos. 7, 8, 11, 22, 24, and 94.

Patents No. 10 and No. 12 related to the design of brass beds. The latter eliminated the use of solid brass tubing by substituting therefor a cheaper, lighter, and stronger iron or steel tube encircled by a thin sheet of brass fastened by means of a locked seam. This gave the petitioner no monopoly, but did give certain advantages in the neatness and strength of the seam.

Patents Nos. 41, 43, 44, 46, 56, 57, 59, 95, 96, 102, 106, and 112 enabled the petitioner to automatically buff and polish all of the exposed portions of the brass beds at a great saving of time and of skilled labor as compared with the former hand method and as compared with the best methods used by competitors. No competitor had such an automatic process.

Patents Nos. 33, 53, 54, 55, 67, 72, 73, and 103 covered machines for automatically bending brass and other tubing into the shape called for by the design of the bed. The hand method by which this was formerly done was a very slow process. Although skilled workmen were employed, considerable material was wasted due to seams buckling during the bending. These machines not only made a more uniform product, but also they saved much material and time and almost entirely eliminated the use of skilled labor.

Patents Nos. 23, 34, 50, 51, 58, 66, 69, 71, 77, 104, and 113 related to the construction of metal beds.

Originally iron beds were made of a very heavy heat welded tube, similar to so-called "gas pipe," with solid iron bars for "filling" spindles, the spindles being joined to the heavy pipe "bows" of the head and foot of the bed by cast iron mounts or by caulked joints. Such construction of iron beds possesssed serious disadvantages. The large amount of metal used not only made the beds very heavy and clumsy, but also was a material factor in their manufacturing cost. Furthermore, the surface of this heavy tubing was rough and did not lend itself to a smooth painted or enameled finish. As a result of these handicaps the iron bed business had, for some time prior to 1915, presented a serious problem to the management of the predecessor company.

Prior to 1915, attempts had been made to remedy this difficulty by the use of a light steel tube, formed out of sheet steel with the parallel edges secured by means of a lock seam. This reduced the weight and cost of the bed and because of its relatively smooth surface permitted a smooth and uniform finish, but due to the fact that the lock seam was not supported by a heavy tube lining such as that used in the manufacture of brass beds, the filling spindles could not be held in place, and the lock seam of the "bows" cracked or opened under the strain occasioned by the movement of the spindles, so that the bed would not stand up under ordinary usage, the seams becoming loose and sometimes pulling out, and the paint cracking off due to the movement of the metal. Manufacturers were seeking a smoother and lighter tube. An electrically welded one was invented, but was too expensive to be practical. In 1915, there was developed what was known as the "ferrule construction" method, upon which patent No. 113 was taken out in that year by the predecessor company. This revolutionized the metal bed industry. In this construction a firm and substantial joint between the filling spindles and the "bows" was effected by a ferrule inserted over the spindle and spot welded to the "bows" along the line of the lock seam, with the result that it was possible for the first time successfully to manufacture and market a light steel tube bed with the advantages of light weight and smooth surface previously described

and yet strong enough to stand up under ordinary usage. No competitor was able to make such a bed at that time. The new tube could be shaped into many new and artistic designs and the beds made from it were not only much more desirable than the old gas pipe beds, but they were considerably cheaper to manufacture and cheaper to ship.

Anticipating the demand for this new product, the petitioner, in April, 1915, began and rushed to completion a new brick building, 400 by 80 feet and 6 stories high, for the sole purpose of manufacturing these beds. Several years elapsed before another improvement came substituting an electrically welded tube which did not involve the use of the ferrule construction.

The other patents related to the design of couches, to certain details of bed construction, and to details of construction of some other miscellaneous products manufactured by the petitioner.

2. *Issue of stock.*—In 1917, the petitioner issued 20,000 shares of preferred stock, par value $100 per share, total par value $2,000,000, under a contract with Z. G. Simmons, whereby he agreed to sell all of this stock for cash at par and the petitioner agreed to pay Simmons, in connection with the sale of this stock, an amount equivalent to $12.50 per share for each share of the preferred stock so sold by him, in addition to the accrued dividends which attached thereto at date of issue.

The issue of this stock and the payment of this amount to Simmons was authorized by the board of directors of the petitioner at a special meeting held on August 6, 1917. Simmons sold this stock to Lee, Higginson & Co. at par and assigned to them the right to receive the above-mentioned amount, namely, an amount equivalent to $12.50 for each share of preferred stock so sold, plus accrued dividends. Lee, Higginson & Co. in turn sold this stock to the public at $95 per share and credited the petitioner with the full $2,000,000 par value of the stock less the above-mentioned amount, which aggregated for all the shares sold $250,000, or a net amount of $1,750,000. In 1917, the petitioner charged the $250,000 on its books as an expense.

Prior to entering into the written agreements hereinbefore set forth, it was understood by the parties that Lee, Higginson & Co., intended to sell this stock to the public at the price of $95 a share, unless, in the judgment of Lee, Higginson & Co., market conditions existing at the time of the offering required or permitted the offering at a lower or higher price.

On August 1, 1919, the petitioner redeemed the entire $2,000,000 par value of preferred stock, so issued, at par, plus a premium of $10 per share and retired and canceled the same.

The petitioner issued 70,000 shares, par value $7,000,000, of preferred stock in the year 1919, and paid Lee, Higginson & Co. of Boston, Mass., on June 17, 1919, the cash sum of $525,255 in connection with the sale of said stock. This sum was computed on the basis of $5.50 per share for the shares of preferred stock issued in exchange for shares of preferred stock previously issued, which were retired at this time, namely, 13,898 shares, and on the basis of $8 per share for the remainder of the issue, namely, 56,102 shares. In 1919, the petitioner charged the amount of $525,255 on its books as an expense, as authorized by the board of directors on August 2, 1919.

Lee, Higginson & Co. sold this stock to the public at $97 per share. They credited the petitioner on June 3, 1919, with the full par value of the stock, namely $7,000,000.

Prior to entering into the written agreements hereinbefore set forth, it was understood by the parties that Lee, Higginson & Co. intended to sell this stock to the public at the price of $97 unless, in the judgment of Lee, Higginson & Co., market conditions existing at the time of the offering required or permitted the offering at a lower or higher price.

The petitioner paid over to Lee, Higginson & Co. on April 30, 1920, an amount equivalent to 2½ per cent of $7,000,000, namely, $175,000, which amount was used by Lee, Higginson & Co. for the purchase of 1,807 shares of preferred stock at an average cost of $96.84 per share, or at a total cost of $174,998.76 (the difference of $1.24 between this amount and $175,000 was returned to the company), which shares were canceled and retired by the petitioner.

The provisions of the petitioner's charter, which relate to the retirement of the preferred stock issued in 1919, are in part as follows:

Within one hundred and twenty (120) days after January 1st, 1920, and every succeeding first of January until all of the preferred stock issued and outstanding has been retired, or its retirement provided for, there shall be set aside as a sinking fund not less than ten (10) per cent of the net earnings of the company as determined by the Board of Directors for the preceding calendar year, after deducting preferred stock dividends paid during each such year; provided, however, that in the years from January 1, 1920, to December 31, 1924, inclusive, the company shall not be required to pay into the sinking fund in any such year more than two and one-half (2½) per cent of the preferred stock issued and outstanding on December 31st next preceding the date when the sinking fund payment is due.

The petitioner in accordance with this requirement, in 1920, retired and canceled 1,807 shares.

OPINION.

## Value of Patents.

MURDOCK: Upon the question of the value of the patents for the purpose of determining a depreciation deduction, the petitioner

relied chiefly upon the testimony of John F. Gail. This man entered the employ of the predecessor corporation in 1898, as foreman in the coil spring department. A little later he started to design machinery and equipment for reducing the cost of its manufactured articles. At that time he was a master mechanic. He has continued in its employ and at the present time, he is consulting engineer for the company. He has been a director in the company since 1915. A great many of the 113 patents are patents of his own inventions, and many of the other inventions patented were developed under his supervision by men in the employ of the corporation.

It has been his duty for many years to keep informed in regard to any and all patents affecting the business of his company. He has a corps of inventors and others under him. The company's patent attorney is also secretary of the company and he has assisted Mr. Gail to keep in close touch with the patent situation. The latter was the company's chief adviser on all matters relating to the development and acquisition of patents from inventors and competitors. His advice upon the value of patents had even been sought by outsiders.

A great many of the 113 patents taken over by this company on January 1, 1916, were patents on machines to eliminate labor, especially skilled labor, to eliminate waste incident to the hand methods of manufacture, and to save time in manufacture. The business was somewhat seasonable and machines of this type were very important to this petitioner. In inventing or supervising the invention of these it was necessary for him to, and he did, keep in mind the practical application of the inventions to the business of the corporation. So that he knew the field in which a labor-saving device was most needed and the probable amount of saving which it would effect. He also had an idea of how much saving had been effected by different machines, the patents on which are included in this group of 113.

Mr. Gail testified that these patents gave the petitioner certain advantages in the manufacture of each kind of product. He pointed out what these advantages were; that due to its patents when changes occurred in the industry, such as the change from woven fabric to link fabric, and from gaspipe and brass beds to the new metal bed, it was most important for this leading manufacturer to have the patents with which it could maintain its position, and that at such a time the possession of the patents in the new field gave more permanent value to its other patents.

In our findings of fact we have indicated certain savings in general terms, but in his testimony he reduced these savings to dollars and cents, based upon the number of articles manufactured upon which the saving applied. He showed that he was thoroughly

familiar with all of the patents involved. He gave examples of how in this business a patent which had become almost useless because of some other patent might still become very valuable later on in connection with some new development. He also pointed out how many of the patents were interdependent one upon the other, how one patent was the basic patent on a machine, how subsequent patents were but developments of that basic patent, and how the value of all of the patents was essentially a group value, because it was due to the patents as a whole that the petitioner maintained its position as a leader in this particular industry, and prevented its competitors from manufacturing what it considered inferior articles which it did not care to manufacture. He contended that as a result of the patents it could, as compared with its competitors, produce superior articles for less money at a greater profit, and that this, coupled with the fact that it was able to pass part of its savings to the public in reduced prices, resulted in the enormous growth of its business.

He readily admitted that there was no such thing as a known market value of many of these patents, in that a patent by its very nature is unique and none of these patents had been on the market. Nevertheless, he maintained that he was in a position to state that the group value of all of these patents was at least as great as the value at which they were carried upon the books of the predecessor corporation on December 31, 1915, which value was $1,396,468.21. With this opinion of his we agree. See *Appeal of Union Metal Manufacturing Co.*, 4 B. T. A. 287, on the question of group valuation.

He did not attempt to give the exact value of these patents, but he stated that in his opinion they were worth much more than this book value and that one or two of them were worth this amount. He attached very great importance to patent No. 113, to the various patents covering machines for the automatic manufacture of springs, and particularly to the patents covering the machines for the automatic bending and polishing of the brass and metal beds.

The respondent contends, not that the patents had no value on December 31, 1915, but that the only fair method of valuing these patents is by the capitalization of excess earnings over a fair return upon the tangible assets. Using this method of valuing these patents he says that 10 per cent is a fair return upon tangible assets. He selects the period of 5 years immediately preceding December 31, 1915. From the average yearly net earnings of this 5-year period, he subtracts 10 per cent of the average net worth of the tangibles to find the annual net earnings attributable to intangibles. He then finds the present worth as of December 31, 1915, of this amount over the average life of the patents by Hoskold's formula, in which he

assumes that each year's earnings consist of interest at the rate of 10 per cent on the entire present net worth and an amount which when invested at 4 per cent interest compounded annually would, at the end of the period of average patent life, yield a fund equal to the present worth. Throughout this period he treats the earnings of each year in the same way.

By this method he determined that the present net worth of the intangibles as of December 31, 1915, was $962,325.89. However, he contends that a part of this value must be attributed to good will. We agree that a part of the value of the intangibles should be attributed to good will despite the fact that the petitioner has attempted to show that there was no good will connected with this business as of December 31, 1915, and despite the fact that up until that date the products had not been marked with any name which was known to the public.

It is our opinion that a business such as this, which had been in existence on December 31, 1915, for over 15 years, had developed some good will while it was attaining a leading position in the industry, even if that good will existed only among jobbers and retailers and did not exist in the mind of the public generally.

However, we do not agree with the respondent that the method used by him is conclusive of, or even the best method for determining the value of the intangibles, and particularly of the 113 patents in this case. There is no evidence to indicate what was a proper rate of return upon tangibles, or what were proper rates for the capitalization of earnings from intangibles by the formula. See *Tyler & Hippach, Inc.,* v. *Commissioner,* 6 B. T. A. 636. In the absence of any better method, or as a test of another method of valuation, a mathematical formula properly applied may serve a useful purpose. In this case we have seen that a great many of the patents involved came into existence during the five-year period used by the respondent, and that some of the most valuable of the patents came into existence during the last year of this period, and that perhaps the one most valuable patent was not issued until December 27, 1915, so that the earnings of this period would not fairly reflect the value of these patents.

It is true that on December 31, 1915, no one knew what the earnings would be for any of the five years following, but it is also true that the petitioner anticipated that there would be a great demand for the new metal beds which it was going to be able to produce as a result of the expected issue of the patent No. 113. In this connection note the decline of brass beds and the rise of metal beds in the percentage table of our findings of fact. It must be remembered

also that anyone familiar with the industry in which this petitioner was engaged would have attempted and with reasonable certainty would have been able on December 31, 1915, to have estimated the probable earnings of this company in arriving at the value of the patents owned by it. In making a retrospective valuation based on any theoretical formula, we may certainly under some circumstances take into consideration events which happened subsequent to the date as of which our valuation is to be made. *Appeal of Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179; *Appeal of J. J. Gray, jr.*, 2 B. T. A. 672, and *Appeal of Keller Mechanical Engineering Corporation*, 6 B. T. A. 990.

If we eliminate the year 1911, which was the first year used by the respondent in his calculation, and substitute therefor the year 1916, which was the first year after December 31, 1915, and otherwise use exactly the same method used by the respondent, which we think involved rates of return and of interest very favorable to a low valuation, we arrive at a value of these same patents which is twice as great as the value arrived at by the respondent, and which is also far greater than the value claimed by the petitioner. This shows the uncertainty of the use of any formula in establishing value, and, if anything, serves to corroborate Gail's opinion that the patents were worth at least $1,396,468.21.

We are satisfied that these patents had a value in excess of $963,325.89 and we are satisfied that all of the intangibles owned by the petitioner had a value considerably in excess of $1,396,468.21. Attributing the value of intangibles in excess of $1,396,468.21 to good will, we are convinced that the witness John F. Gail correctly stated that the value of these patents was at least $1,396,468.21 on December 31, 1915.

The petitioner is entitled to deduct, in computing net taxable income for the years 1919 and 1920, as a reasonable allowance for depreciation of its patents, that portion of this total value of this group of 113 patents which bears the same relation to the total value as the life which expired in each such year bears to the total unexpired life of the group on the date of acquisition, plus a portion, similarly computed, of the cost of the 6 patents subsequently acquired. The parties agreed at the hearing that this was a proper method of calculating the deduction and only contested the patent value. We see no reason why this method may not be used.

## Stock Issue.

At the hearing and in its brief the petitioner conceded that that portion of the alleged commission which represented the difference

between par value of the stock and the price at which it was sold was not a commission and should not be deducted as an expense. We think that this is properly conceded in view of the previous decisions of this Board that a corporation can have no gain or loss on the sale or purchase of its own stock. See *Appeal of Simmons & Hammond Manufacturing Co.*, 1 B. T. A. 803, and *Appeal of Farmers Deposit National Bank*, 5 B. T. A. 520. That part of the so-called commission which served to cancel the difference between the selling price and par was in no sense a commission. So far as this case is concerned we can see no reason why it may not be disregarded entirely.

· The petitioner's first point then was that the actual commissions paid were expenses of selling its preferred stock and should be deducted from income in the year in which each such expense was incurred, because the issue of preferred stock to obtain additional capital is an ordinary and generally necessary transaction in the conduct of a business enterprise and the expense of such an issue is an ordinary and necessary expense.

The Board considered this same contention in *Appeal of Charles H. Lilly Co.*, 2 B. T. A. 1058 and in *Appeal of Emerson Electric Manufacturing Co.*, 3 B. T. A. 932 and held, adversely to the petitioner, that brokers' commissions, like the ones paid in this case, were not deductible as ordinary and necessary expenses in the year in which paid. In the latter case the findings of fact state that the brokers " subscribed " for the stock, but it is apparent from a consideration of the entire transaction that they were not purchasers but merely selling agents.

Correctly anticipating that the Board would not reverse its earlier decisions, the petitioner next urged that, in accordance with those decisions and with T. B. R. 40, 1 C. B. 281, the amount of the commission must be included in invested capital, just as the respondent did include it, as an amount paid for the acquisition of some capital asset. The petitioner reasons that had land been acquired the commission could have been added to the cost of the land and thus have remained in invested capital; that as dollars were acquired, although the commission can not be added to the cost of the dollars, nevertheless it *remains* in invested capital as an intangible asset, the exact nature of which is undefined, but which is connected with the money and should only remain so long as the money remains in the business and when the money is paid out to retire the stock, the asset should be charged off and deducted from income as a loss in that year; that this would be analogous to the charging off of a commission for the

sale of bonds, except that in the latter case the charge-off is prorated over the known life of the bonds.

We are certain that under no circumstances can invested capital be *increased* by the amount of a commission which a corporation pays for the sale of its stock to those who thereby become stockholders. Nor can it be increased by the difference between the selling price and par of the stock.

In defining " invested capital " the statutes provide that it shall include " actual cash bona fide paid in for stock or shares;   *   *   *." We have interpreted this as meaning all money actually paid in to a corporation by the stock purchasers as a contribution toward the capital of such corporation. *Appeal of Middleton Compress & Warehouse Co.*, 1 B. T. A. 1145; *Appeal of Guarantee Construction Co.*, 2 B. T. A. 1145. The difference between selling price and par was not paid in by the stock purchasers. The commission, although paid in by the stock purchasers, was paid out immediately by the corporation, resources were reduced by the amount of the payment. Instead of increasing invested capital by the amount of the commission we should rather inquire why it should not be decreased by this amount. T. B. R. 40, I. C. B. 281, advances no logical reason for increasing invested capital by the amount of commissions. It may be true that the amount paid in commissions is essentially a capital expenditure, but not all capital expenditures are " invested capital." If this is a capital expenditure it is not balanced by the acquisition of a permanent capital asset of equivalent worth, because the balancing asset is the amount of money received for the stock and it can not balance anything more than the value of the stock issued for it. Dollars are dollars and they can not be carried at more than par. See *La Belle Iron Works* v. *United States*, 256 U. S. 377.

Let us consider the mechanics of increasing or reducing " invested capital " as that term is used in the Revenue Act of 1918. It is defined in section 326(a) and to this section we must look to see exactly what it includes. By paragraph (1) we learn it means "Actual cash bona fide paid in for stock or shares." It has been held that invested capital which became such by reason of this provision is not reduced by an operating deficit, but only by and to the extent of a return of capital to the stockholders, as for example by way of a dividend or retirement or purchase of the stock by the corporation. *Appeal of Kenny Brothers Co.*, 1 B. T. A. 1019; *Appeal of Valdosta Grocery Co.*, 2 B. T. A. 727; *Appeal of Hutchins Lumber & Storage Co.*, 4 B. T. A. 705; *United States Corporation Bureau* v. *Commissioner*, 6 B. T. A. 170.

Invested capital which is such because of the provisions of paragraphs (2), (4), and (5) is very similar if not the same as that above discussed. But now let us look at paragraph (3) which tells us that invested capital also means "paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year." For the purpose of our case it is not necessary to discuss the effect of the words "paid-in" as used in this paragraph of the subsection and as some authorities may hold that a paid-in surplus may differ from an earned surplus we will leave the discussion and decision of this point until a case arises which requires such discussion and decision. See, however, *La Belle Iron Works* v. *United States, supra,* where the court, in discussing a similar provision of an earlier act, said:

* * * The provision of clause (3) that includes "paid in or earned surplus and undivided profits used or employed in the business" recognizes that in some cases contributions are received from stockholders in money or its equivalent for the specific purpose of creating *an actual excess capital over and above the par value of the stock;* and in view of the context, surplus "earned" as well as that "paid in" excludes the idea of capitalizing (for the purposes of this tax) a mere appreciation of values over cost. (Italics ours.)

Here we confine ourselves to that part of section 326 (a) (3) which appears after the first two words "paid-in or." Invested capital which is such by virtue of this portion of the subsection is quite different from that discussed in a preceding paragraph of this opinion. See *Appeal of Valdosta Grocery Co., supra.* This latter sort of invested capital is materially affected when the corporation pays out money. If the corporation uses its earned surplus as of the end of last year to pay for an ordinary and necessary expense of this year, invested capital is clearly reduced. See *Appeal of Kenny, Brothers Co., supra.* An operating deficit may wipe out earned surplus and undivided profits, which had been included in invested capital, and thus reduce invested capital. *Appeal of W. S. Bogle & Co.,* 5 B. T. A. 541, and previous cases therein cited. (The case of *Milton Dairy Co.* v. *Willcuts,* 15 Fed.(2d) 814, in which certiorari has been granted, 273 U. S. 687, is to the contrary. But see the opinion of Judge Learned Hand, now of the Circuit Court, in *Lincoln Chemical Co.* v. *Edwards,* 272 Fed. 142, affd. at 289 Fed. 458, and see also *La Belle Iron Works* v. *United States, supra.*) Other things, including the sale of additional stock at less than par, may affect this sort of invested capital. In balance sheets and in bookkeeping earned surplus and undivided profits appear as liabilities and they may be reduced as the assets which offset them decrease in total value. If a corporation pays out money in excess of its current earnings and if, to keep its accounts balanced, it should properly reduce the amount

of its earned surplus or of its undivided profits, which has served to create a part of its invested capital, thereby its invested capital will be reduced unless the thing which was acquired by the expenditure of the money is such that its cost or value goes into invested capital and balances the above reduction. By the payment of a commission for the sale of its own capital stock a corporation acquires nothing the cost or value of which can be included in its invested capital to offset any reduction in its earned surplus or undivided profits as of the beginning of the year.

In order to determine the effect on invested capital of an expenditure by the corporation we must know at least sufficient facts concerning the condition of the finances of the corporation and of the manner in which its invested capital originated to decide whether its earned surplus or its undivided profits, if it had either or both, was or were reduced. If in any given year a corporation issues additional capital stock for cash, its previous invested capital is increased by the amount of cash which the stockholders paid in for the new stock. If it then pays a commission for the sale of this stock such payment may or may not reduce invested capital depending upon what that invested capital includes. If then at a later time a portion of this stock is retired, invested capital is reduced by the amount of capital returned to the stockholders, that is, by the amount paid by the corporation for the stock. Invested capital is neither increased at the time stock is issued nor decreased at the time stock is retired by the amount of commissions paid for the original sale of the stock.

The calendar years 1919 and 1920 are before us and it is our duty to determine the correct deficiencies for these two years. We must then decide what effect, if any, the payment of these commissions had upon invested capital for these two years.

Applying these principles to the present case we assume that in the year 1917, which is not before us, the existing invested capital was increased by $1,900,000 on account of the issue of 20,000 shares of preferred stock of a total par value of $2,000,000 at $95 per share. We know that the amount of the $150,000 commission was " included " in invested capital at that time. Without knowing more facts, we can not say either that this was proper or improper, but we must assume that the Commissioner has correctly determined invested capital as of the beginning of the year 1919, which is before us. We know that in 1919, when this stock was retired, the Commissioner reduced invested capital by the amount of the commission. In this he was in error. On August 1, 1919, the petitioner redeemed, retired and canceled the 20,000 shares of preferred stock by paying therefor $110 per share, or $2,200,000. On account of this fact its

invested capital was reduced by $2,200,000 as of August 1, 1919, and this reduction should be considered in computing its average invested capital for the year 1919. Any further reduction of invested capital in 1919 or 1920 on account of these shares of stock or the commission paid for their original issue was in error.

In 1919, the petitioner issued 70,000 shares of preferred stock of a total par value of $7,000,000, for which the stockholders paid in on June 3, 1919, $97 per share, or $6,790,000 in cash. Therefore, on June 3, 1919, the petitioner's existing invested capital was increased by $6,790,000 on account of this fact and the average invested capital for the year should be computed by taking into consideration this increase. Here again we know that the Commissioner "included" the amount paid as commission in invested capital, but we can not say whether or not his action was proper. We do not know what constituted the petitioner's invested capital at the time the commission was paid or incurred. We do not have before us any balance sheets as of that time showing the state of the petitioner's finances. We do not know the amount of current earnings available at that time, nor do we know any other facts sufficient to guide us in determining whether or not the action of the Commissioner in this regard was proper. Consequently, again we must assume that his action was proper and that if he did not reduce invested capital by the amount of the commission paid, the payment had not served to reduce earned surplus or undivided profits which had previously been included in invested capital.

In each instance where for lack of information we have held that he has properly "included" the amount of the commission paid we are assuming that "included" simply means not excluded, or in other words that the "invested capital" to which the petitioner was entitled before the commission was paid was not decreased or reduced by the amount of the commissions paid and we do not understand that he has increased that existing "invested capital" by the amount of the payment, for, as we have previously pointed out, such a payment can never serve to increase "invested capital."

On April 30, 1920, the petitioner redeemed, retired and canceled 1,807 shares of this preferred stock by paying therefor approximately $175,000. Its invested capital was decreased on that day by that amount and its average invested capital for 1920 should be computed by taking into consideration this reduction. See *Appeal of Simmons & Hammond Manufacturing Co.*, supra, and *Appeal of Farmers Deposit National Bank*, supra.

There is no allegation and no proof that the Commissioner has reduced invested capital either in 1919 or in 1920, on account of the

payment of the 1919 commission and we do not feel called upon to discuss this feature of the case further.

It will be seen from our discussion of invested capital that no deduction of any portion of the money paid out in these commissions is authorized by section 234(a)(7) of the Revenue Acts of 1918 or 1921. Neither property used in the business nor an exhausting asset was acquired by the payment of this money. We know of no other way under the revenue acts in which expenditures made in one year can be deferred and charged off in later years which would affect this case. The petitioner never contended that a loss resulted from the payment of the commissions and inasmuch as they were made voluntarily we are satisfied that no deduction on account of them is authorized by sections 234(a)(4) of the above Acts.

Good accounting practice would not permit commissions paid for the sale of stock to be carried as assets on the books of a corporation, but would require them to be charged off as quickly as profits permitted. This is because the expenditures are not balanced by the acquisition of any salable asset and the true financial condition of the corporation can not be shown until they have been written off. Applied Theory of Accounts, Esquerre, p. 317; Auditing Theory and Practice, Montgomery, 3d ed., vol. 3, p. 576; Accounting Theory and Practice, Kester, vol. 2, p. 331. The science of accounting seeks to record facts so that the success or failure of an effort to accomplish a purpose will be made evident in dollars and cents. It in some way deducts at some time or times every expenditure from income. The revenue acts do not necessarily do this. They may vary from the best accounting practices in arriving at net income. *Appeal of Consolidated Asphalt Co.*, 1 B. T. A. 79. Although we will attempt, whenever it is possible, to interpret the revenue acts as concurring with good accounting practices, we can not allow any deduction from net income not authorized by those acts. They do not authorize any deduction of the amounts paid by a corporation as commissions for the sale of its capital stock.

Reviewed by the Board.

*Judgment will be entered on notice of 15 days, under Rule 50.*

SMITH and TRAMMELL concur in the result.

MILLIKEN: I dissent from that portion of the opinion which disallows the deduction as an ordinary and necessary expense of commissions paid for the sale of the corporation's capital stock.